I. J. DANFORD, PLAINTIFF IN ERROR, v. THE STATE OF
FLORIDA, DEFENDANT IN ERROR.

1. Where the court refuses to permit a proper question on
cross-examination of a witness, but it appears from an-
other part of the evidence that the question was sub-
stantially answered so as to prove what was designed to
be brought out by the question which was not allowed, no
reversible error is shown.

2. It is the duty of a party to avoid a difficulty which he has
reason to believe is imminent, if he may do so without
exposing himself to the apparent risk of death or great
bodily harm; and whatever qualifications this principle
may, in application, have, will depend upon the circum-
stances of each particular case. As for instance, a man
assaulted in his own house or on his premises near his
house is not obliged to retreat, but may stand his
ground and use such force as may appear to him as a
cautious, prudent man to be necessary, to save his life
or to save himself from great bodily harm. Nor is a
person whose life has been threatened obliged to quit his
business to avoid a difficulty; but he cannot lie in wait
for his adversary; and in cases where a combat is mutu-
ally sought, the duty of retreating applies to both parties,
for both being in the wrong, neither can right himself
without retreating.

3. A charge given by a trial judge should not hypothesize the
existence of facts not proven, nor should inferences be
drawn by the court from facts, unless those facts are
shown by the evidence, and are such as must follow in
law from the proven facts; but a charge is not objection-
able which does not assume the existence of any fact,
nor draw inferences from any proven fact, but leaves it to
the jury to find the facts, and to draw inferences from
them.

4. The correctness of a portion of a charge is to be deter-

mined by a consideration of the whole charge. If a paragraph of a charge is bad law, injurious to the defendant and conflicting with other portions of the charge, the error would be fatal.

5. Men do not hold their lives at the mercy of the unreasonable fears, or cowardice of others. Instructions to the effect that where a homicide is committed from excessive cowardice, the defendant cannot be convicted of murder in the first degree, or of a higher degree than manslaughter, are properly refused; and especially when the evidence does not show that the defendant was actuated by cowardice.

6. The trial judge commits no error in refusing to give instructions which undertake to define the phrases "actual danger" and "apparent actual danger," as these expressions are not technical and need no definition. Especially is this true when he gives instructions in behalf of the defendant which hypothesize the facts, showing "actual danger" and "apparent actual danger," from the defendant's standpoint, and instructs the jury to acquit the defendant if they find these facts to exist.

7. It is erroneous to permit the state attorney, over the objection of the defendant, to read to the jury from a paper, not introduced in evidence, but under circumstances suggesting that the paper contained the evidence of a witness for the defendant at the preliminary hearing in order thereby to show that material testimony of the witnesses at the trial was in conflict with the testimony of said witness at the preliminary hearing, when the witness expressly denied making the statements contained in the paper or did not admit making them, and it was not shown by any competent evidence what the testimony of the witness was at the preliminary trial; and such error is not cured by an instruction of the judge that the paper writing was not evidence and could not be used as evidence, but that the state attorney

was permitted to use it to refresh his memory, as to the admissions made by the witness.

This case was decided by Division B.

Writ of error to the circuit court for Jackson county.

## STATEMENT

I. J. Danford was indicted and tried at the Spring term of the circuit court of Jackson county, Florida, 1906, for the murder of Coley Clark on the 15th of March, 1906, by shooting him with a shot gun loaded with powder and balls. He was convicted of murder in the first degree with a recommendation to mercy.

Coley Clark was a boy about sixteen years old at the time he was killed. It appears from the testimony that Coley Clark was the son of one Joannah Wadkins who had three children, viz: Coley, about sixteen years old, Willie, about fourteen and a half years old, and Emily, a girl, whose age is not given. Joannah Wadkins and I. J. Danford lived something over a hundred yards apart on the public road leading from Cambellton to Cottondale running north and south. The killing occurred in the public road about 250 yards north of Danford's house about four o'clock in the afternoon of the 15th of March, 1906, which was on Thursday. Danford was standing on the inside of his field about thirty steps from Coley Clark when he shot and killed Coley and also with the second barrel of his gun shot and wounded Willie Clark. The boys were hailed by Danford and told to hold up and almost immediately afterwards Danford fired on Coley, killing him, and then shot Willie. The place where the shooting occurred was about four hundred yards north the Wadkins house and in view of it.

On Monday before the killing of Coley (on Thursday) a

quarrel had taken place between Danford and Joannah Wadkins about a hog, or the division of the meat of a hog, which Danford had killed. This occurred at the Wadkins house. It is evident there was a good deal of bad feeling on the part of the Wadkins family towards Danford about this hog. On the afternoon of the killing Coley started from his mother's house to go north on the public road leading by Danford's house and the field where Danford was at work splitting rails. It seems Willie was with him, and after going nearly to the front of Danford's house, ran back home and got a gun and two shells and then overtook his brother. Willie was carrying the gun on his shoulder up to the time the boys were hailed by Danford. When the shooting occurred Mrs. Wadkins was standing on the yard fence where she could see up the road to the place where the shooting occurred. She says she went out there to call her children because she did not want them to go down the road. Mrs. Wadkins says her daughter Emily "was sitting on the cow pen fence, so that if any trouble came, she could see it.". Mrs. Wadkins also says she was on the fence and that she knew Mr. Danford was at work in his field, before the boys went down there. The defendant's testimony tends to show that Mrs. Wadkins and Coley had recently before the killing made threats against Danford, using a great deal of profane language, and that some of these threats had been communicated to Danford. Danford's testimony and that of his daughter Callie tends to show that Coley had endeavored to shoot him at the Wadkins' house, the day before the killing. Mrs. Wadkins and her children denied making these threats and denied that Coley had tried to shoot him. Callie Danford, a daughter of the accused, testified to the effect that she was at the wood pile (probably near her father's house) when she first saw Coley Clark

immediately before the killing. Coley came down where she was. He said "I see old Danford, the G—— d—— s—— of b——. I am going to kill him. I think he has made threats long enough. Coley told Will to go back and get the gun that he saw the G—— d—— s.—— of b——. Will went back and got the gun. Their mother told them to kill him. Coley said to Will: 'Will, you take the gun so Danford the G—— d—— s—— of b—— will not expect nothing.' He said 'I want you to take the gun somebody might suspect me.' I ran through the house and out of the back door across the field to tell papa." She ran through the field, got over the fence, passed the boys (Coley and Willie) ran to her father and told him what Coley said. "I said Papa they are coming to kill you because they said they were." Willie Clark denied that Coley used some of the language which Callie Danford said he used as to seeing Danford, and telling him, Willie, to go back and get the gun. Mrs. Wadkins, her daughter Emily, and Willie Clark, besides the Danfords, all say that they saw Callie run out of the house, by the boys on the road and go to her father. Danford had his double barrel shot gun with him, setting near him in the corner of the fence. It was loaded with number three shot, and black powder. It was a muzzle loading gun. Danford testified that he carried his gun out with him that evening as he expected to go to a Mr. Mathis, there were some woods to go through, and he thought he would shoot some squirrels, also that he carried his gun with him when he went off. In this connection one of the witnesses testified that when he asked Mr. Danford why he did not had a peace warrant against Coley, Mr. Danford said in effect that he trusted to his gun, rather than to the courts. He also testified that Mr. Barkett told him the day before the killing of Coley that the boys were making threats against him and were

going to kill him, and also that his wife had told him of their threats at the dinner table on Thursday the day of the killing, and a few hours before the killing.

Willie Clark testified that he and his brother Coley left home to go to a Mr. Tool's. There is some discrepancy between the testimony of Danford and his daughter Callie on the one side, and Willie Clark on the other, as to the immediate circumstances of the shooting. Willie Clark states in substance that he and his brother were walking along the road. He was behind Coley about a half a foot with his gun on his left shoulder with the butt in front and the barrel behind him; that Mr. Danford picked up his gun, said "hold up there boys" and immediately fired twice in rapid succession. That Coley wheeled to run as he was shot, and immediately afterwards he, Willie, ran about twenty or thirty steps and was shot. That Coley had nothing in his hand and had made no effort to get the gun from him when he, Coley, was shot, and that he, Willie, had the gun and made no sort of demonstration of intention to use it on Danford. Mrs. Wadkins, though nearly or quite four hundred yards away, testifies that she saw the shooting and heard what was said and her testimony is substantially the same as Willie's. Danford says: "I was in the little patch splitting rails. I saw Coley Clark just before I received that information (alluding to threats made by Coley against him). He was coming down the road from towards his home coming in front of my house, and stopped in the road and turned his face as towards the house as if he was talking to some one, Willie Clark was back behind him with the gun. I seed him coming from the house towards the gate, he came out of the gate and came with Coley. I don't know as I saw my daughter (Callie) at that time. This fence makes a crook, there is a good smart fence inside the road for a wood-pile.

She was in this place. I saw her shortly after I saw Coley Clark standing there. When I first noticed her she was running down the field from the house, from the back of the house, kinder in a triangular across the field and got over the field fence two or three panels from the corner, went through the road, passed the two boys here (here witness illustrated on a diagram). She ran all the way from the house to where I was. She came over in the field and told me they were coming to kill me, the boys were coming to kill me. I watched them from then on. The boys were walking in the road. Will had his gun on his left shoulder after he crossed the branch, before they reached the field, Will taken it from the left and placed it on his shoulder next his brother. They came up close to the corner of the field and he reached for the gun. Coley reached for the gun. When he reached for the gun I told them to halt, and they didn't do it, and I fired. I believed they were going to kill me. Coley reached for the gun before I said anything, before I said anything he had hold of the gun. They did not halt and I shot. I thought my life was in danger when I fired. *I expected their intention* was to kill me and that is why I shot. I believed that they were going to shoot me. I shot twice, the shots were fired close together, just as soon as I could pull the trigger I shot. I fired the second shot before the smoke of the first got away. Both of the boys were close together. After the shooting took place I put up my tools, finished up the job I was on, then put the tools in the house. After that I walked over in the field where Mr. Barkett was, talked with him a little, turned around and went back home." On cross-examination Danford said the boys had passed up the road twice that day before the shooting occurred. The first time Coley passed he had his shot gun but Danford was not out then. When he passed back he didn't have his gun. He states that

Danford v. The State of Florida—Opinion of Court.

Coley never said anything to him "never spoke a word," that he had spoken to Coley on Wednesday about the threats he had made that "Coley passed by going to Burkett's that morning and then came back and he had not been gone long when Will and the little boy went to Burkett's for the gun. They didn't bother me then." He further testified on cross-examination that "the boys were thirty-three steps away from me when I stopped (working) and picked up my gun or. may be thirty-five steps. They had not made any attempt to put the gun on me:    *    *    * my gun was eight or ten feet from me setting in the corner of the fence    *    *    *    they both had hold of the gun when I fired."

There was testimony tending to show both good and bad character on the part of Danford and Coley Clark, and also testimony tending to impeach and also to sustain the reputations of several of the witnesses for truth and veracity. Danford was born in 1840 and was about 66 years old at the time of the homicide. Some further statements of the evidence will be made in the opinion.

*Price* & *Watson*, for Plaintiff in Error;

*W. H. Ellis*, Attorney General, for the State.

HOCKER, J., (*after stating the facts*) : The first assignment of error is based on the refusal of the court to permit the defendant's attorneys to propound to Willie Clark, a State witness, on cross-examination, the following question: "Before you got down to Danford was she on top of the fence?" The question was designed to show that the mother of Willie Clark had left their house and gone to the fence, some thirty or forty yards, and had gotten up on the fence so that she could see what was occurring

down the road where the shooting occurred. There is no reversible error shown, because the mother herself in her own testimony substantially stated that she did what was here attempted to be proven.

The second and third assignments of error are based on the action of the court in overruling defendant's objections to the following questions propounded by the state attorney to the defendant Danford, on cross-examination, viz.: "You could have turned and went this way in the field." "There was nothing to keep you from coming and going this way (indicating)."

Danford at the time of the homicide was at work in a little field splitting rails two hundred and fifty yards from his house. The public road ran by his house and by the field, and he was standing a few feet from the road, a fence being between him and the road. The deceased was passing along the road, with his brother Willie Clark, both boys. Coley about 16 and Willie about 14½. Willie had a gun on his left shoulder, and there is a conflict in evidence as to whether Coley attempted to get the gun from Willie about the time of the shooting. It is not contended that Willie attempted to use the gun on Danford. Nor is it contended that Danford attempted to get out of the way of the boys, who were coming down the road. On the contrary, Danford testified in answer to these questions that he did not go away or attempt to go away, but stood his ground as he thought he had a right to do, as he was on his own premises, engaged in his own business. It is contended that inasmuch as the court charged the jury that before Danford could avail himself of the plea of self-defense he must have used all reasonable means within his power to avert the danger and avoid the necessity of taking the life of the deceased, and

inasmuch as the state attorney argued to the jury from the answers of Danford that he might have avoided the difficulty which he was advised was imminent and might have left his work and gone off in several directions and that he did not do so, Danford could not avail himself of the plea of self-defense, therefore the court erred in over-ruling defendant's objections to the questions. It is contended that under the law a person is not obliged to resort to flight, so long as he is where he has a right to be, and is neither engaged in an unlawful enterprise, nor the provoker nor aggressor in a combat, quoting Long v. State, 52 Miss. 23, text 35, and other authorities.

It cannot be denied that it is the duty of a party to avoid a difficulty which he has reason to believe is imminent, if he may do so without apparently exposing himself to death or great bodily harm (Stafford v. State, 50 Fla. 134, 39 South. Rep. 106; Snelling v. State, 49 Fla. 34, 37 South. Rep. 917; Peaden v. State, 46 Fla. 124, text 135, 35 South. Rep. 204), and that whatever qualification this principle may in application have will depend upon the circumstances of each particular case. Allen v. United States, 164 U. S. 492, text 498, 17 Sup. Ct. Rep. 154; Wharton on Homicide (2nd ed.) Sec. 485. For instance, a man violently assaulted in his own house or on his premises near his house is not obliged to retreat, but may stand his ground and use such force as may appear to him as a cautious and prudent man to be necessary to save his life or to save himself from great bodily harm. Allen v. United States, *supra*. A person whose life has been threatened is not obliged to quit his business to avoid a difficulty. Ballard v. State, 31 Fla. 266, 12 South. Rep. 865. But he cannot lie in wait for his adversary. Smith v. State, 25 Fla. 517, 6 South. Rep. 482. In cases where

a combat is mutually sought, the duty of retreating seems to apply to both parties, for both being in the wrong neither can right himself without retreating. 1 Bishop's New Cr. Law, Secs. 869, 870. The evidence in the instant case suggests very strongly that Mr. Danford knew that a difficulty between him and the Clark boys was imminent. He seems to have prepared himself for it by taking his gun with him on the afternoon of the shooting, loaded with No. 3 shot, and have found work for himself within his field near the public road, some distance from his dwelling house, along which road these boys had been passing two or three times a day. That he relied on his gun for protection rather than the law. These boys were not on his premises when he shot them, but in the public road. He did not wait for them to accost him. He spoke first and told them to stop, instantly advancing toward the fence, picked up his gun and began firing. The jury were entitled to the fullest knowledge with reference to the surroundings so as to form intelligent views with reference to the motives and intentions of the accused. We do not think reversible error is shown.

The fourth and fifth assignments of error are based on the overruling of the following questions propounded to Mr. Danford by the state attorney on cross-examination, viz.: "Why did you not tell them that if they came up there you would kill them?" "After your daughter and other people had told you they were going to kill you and you saw them coming with a gun to kill you, and you had your gun and fence between you, why didn't you holler when they were one hundred yards away, and say, 'boys, if you come up here I will kill you?'" The first question was not answered, and the answer made to the second was not responsive to it, and we cannot discover that even

granting the question to have been improper, the answer was unfavorable to the accused. No injury is shown.

The seventh assignment of error is based on the following charge given by the court to the jury: "If you should find from the evidence beyond a reasonable doubt, that at any time before the killing of Coley Clark by the defendant, if you find he did kill him, the defendant formed in his mind an intention to kill Coley Clark, that thereafter he contrived, devised and planned by the use of his mental faculties the manner and method of such intended killing to be by means of shooting Clark with a shot gun, that in pursuance of such method or plan, so thought out and devised, he procured or prepared a shot gun as the weapon with which to execute the design previously formed to kill and carried it with him to his field, knowing or believing that the said Coley Clark would pass that way and intending to kill him by shooting him with the gun if he did, that thereafter Coley Clark passed along a public road in company with his brother, which led them near the field, that the defendant, when the said Coley Clark and his brother came in carrying distance of the defendant's gun, if they did so come, shot and killed Coley Clark unlawfully, in pursuance of the plan or method so previously devised and with the shot gun so procured or prepared and from and with the design to kill so previously formed and entertained, and that such killing occurred in Jackson County, Florida, at any time before the indictment in this case was found, and that the killing was perpetrated in the manner and by the means alleged in the indictment, that it will be your duty to find the defendant guilty of murder in the first degree." The objection to this portion of the charge is that it was strictly a charge on the facts, but that it con-

tained inferences of fact drawn by the court from other facts, which were not proven in the case. Undoubtedly a charge should not hypothesize the existence of facts not proven, nor should inference be drawn by the court from facts unless those facts are shown by the evidence and are such as must follow in law from the proven facts. Blashfield Instructions to Juries (Civil & Criminal) Sec. 4; Kelly v. State, 44 Fla. 441, 33 South. Rep. 235; Beard v. United States, *supra*. But in this case the charge does not assume the existence of any fact, nor does it draw any inference from any proven fact. It leaves the jury to find the facts and to draw inferences from them, and simply directs them as to the law, if they should draw certain inferences from the facts. Under our system this is a common practice, and in the instant case we think there was testimony from which the jury might have drawn the inferences mentioned in the charge. Objection is made to the following portion of the charge: "The mere fact, if it be a fact, that Coley Clark was a person of bad reputation for peace and quietude, or that he or his brother had made threats against the life of defendant, if such threats were made, or that Coley Clark or his brother was armed with a weapon at the time of the killing, if such was a fact, would not justify the defendant in killing Coley Clark, if he did kill him, but the defendant's justification in killing Coley Clark, if he did kill him, can be found only in the facts, if they are shown by the evidence establishing self-defense."

The objection urged is that this charge minimized the importance of threats, deprived the defendant of the right to act upon appearances in the light of the threats, and in the use of the word "established," as to the facts of self-defense, deprived the defendant of the benefit of a

reasonable doubt as to whether he acted in lawful self-defense. The correctness of a portion of a charge is to be determined by a consideration of the whole charge. If a paragraph of a charge is bad law, injurious to a defendant, and conflicting with other portions of a charge, as in the case of Lane v. State, 44 Fla. 105, 32 South. Rep. 896, the error would probably be fatal. The charge of the trial judge as a whole was luminous and correct, in all its phases, and in several places dwells upon the right of the defendant to an acquittal if there should be a reasonable doubt of his guilt; and in the sentence immediately preceding the portion here quoted is this language: "If you believe from the evidence that the defendant acted in lawful self-defense in killing Coley Clark, if you find he did kill him, or if *you entertain a reasonable doubt whether the defendant was acting within the lawful rights of self-defense you should find him not guilty.*" The use of the word "established" was perhaps unfortunate, but taken in connection with what preceded, we cannot say the jury were misled. We find no reversible error.

Several other portions of the charge of the court are objected to not because they are incorrect in the abstract but because they were, under the facts, unfair to the accused. It is the contention of the plaintiff in error that the evidence shows he was first violently assaulted by Coley Clark and was not the aggressor in the difficulty in which Coley was killed. We have carefully studied the evidence and we are of opinion that it is of such a character as made it a question for the jury to determine whether Coley Clark made any assault upon Danford, or made any demonstration which would have justified

2—S C

him, as a reasonably cautious and prudent man, in believing his life was in danger, or that he was in danger of great bodily harm. We find no error in these portions of the charge.

The twelfth and fourteenth assignments of error are based on the refusal of the court to give two instructions requested by the accused argued together. The first embraces the proposition that if Danford killed Clark from an excess of cowardice and not from any premeditated design to effect his death then the jury should not convict Danford of murder in the first degree. The second embraces the proposition that if Danford killed Clark in the sudden heat of passion or from excessive cowardice, and he was not acting from a premeditated design to effect Clark's death, or that of any other person, and that the killing was not by an act imminently dangerous to another, evincing a depraved mind regardless of human life, then the jury should not find Danford guilty of any higher degree of crime than manslaughter.

The judge in his general charge had elaborately and clearly discussed and defined murder in the first and second degrees, and manslaughter. These instructions were evidently intended to invoke excessive cowardice as a defense to, or at least a mitigation of, the crimes of murder in the first and second degrees. It is contended that if the accused committed an unlawful homicide, his mind and judgment overwhelmed by excessive and unreasonable cowardice, he could not be guilty of either degree of murder. No authorities are cited in support of this contention and we have not been able to find any. It is admitted that the judge correctly charged the jury that "men do not hold their lives at the mercy of the unreasonable fears or excessive cowardice of others, and if

from such motives the defendant killed Coley Clark without any apparent good reason for so doing he could not justify his act." We do not think the facts of this case require us to qualify this doctrine. Mr. Danford testified "both the boys were facing me when I shot. I told my daughter to get out of the way. I told my daughter to get out of the way, I didn't aim to move. I didn't aim to run off, for I think it is a mighty sorry man that will run." This testimony does not indicate that Danford's judgment was obscured by excessive cowardice.

The fifteenth, twenty-third, twenty-fourth, twenty-fifth and twenty-sixth assignments of error are based on the refusal of the court to give certain charges based on the theory that Danford at the time of the homicide was on his own premises, and was not under the circumstances obliged to retreat in order to avoid a difficulty with Coley Clark. The doctrine that a man assaulted on his own premises is under no duty to retreat, but may stand his ground and resist the assault with whatever force may be necessary, even to the taking of life, has its origin in the common law theory that a man's house was his castle. I Bishop's New Crim. Law, Sections 858, 859. This doctrine has been by some courts extended to the premises immediately adjoining the dwelling house, and other buildings, such as an office or place of business. But we have been cited to no case where it has been applied to a case like the present where the difficulty occurred two or three hundred yards from the dwelling house in the corner of the field of the slayer, and where the person slain was walking along a public road where he had a right to be, and where he was not a trespasser.

The plaintiff in error cites three cases in support of his contention: Brinkley v. State, 89 Ala. 34, 8 South. Rep.

·22; Askew v. State, 94 Ala. 4, 10 South. Rep. 757; State v. Cushing, 14 Wash. 527, 45 Pac. Rep. 145, S. C. 53 Am. St. Rep. 883. In Brinkley v. State, the killing occurred in the defendant's own dwelling house, in Askew v. State, the defendant was assaulted in his livery stable, and in Cushing v. State, the deceased went to the home of defendant and abused him for several hours. The defendant ordered him away, and when he did not depart defendant ·went into his house and got his gun with the view of frightening the deceased away, or of defending himself if necessary. When he appeared outside the house the deceased rushed upon him with a club and then defendant fired upon him. The facts of these cases are not analogous to those of the one at bar, and we do not think the doctrine applied in those cases is applicable in the instant case. Taking Danford's testimony alone, and the case has some of the aspects of a mutual combat. He first hailed the Clark boys, who were walking along the public road in a direction which would have carried them by him. It cannot be said that they were approaching him. When he hailed the boys he stepped toward the fence and picked up his gun. Doubtless Coley Clark saw this action, and grant that he endeavored to get the gun from his brother, yet before he could get it he was shot by Danford. If Danford foresaw that he was to be attacked, as he says he did, then it seems to us, under the circumstances, he was under obligations to use reasonable efforts to avoid the necessity of killing Coley Clark. I Bishop's New Cr. Law, Sec. 869; Stafford v. State, 50 Fla, 134. He used none.

The nineteenth assignment of error is based on the refusal of the court to give an instruction undertaking to define "actual danger" and "apparent actual danger"

as applied to the law of self-defense and to discriminate one from the other. The court had in his general charge instructed the jury fully that in order to self-defense the danger to the accused need not be real, but that if there was apparent danger and the appearances were such that a reasonably prudent and cautious man in the same situation would believe it real, and the defendant did so believe, he would be justified in taking such steps and using such force and means as reasonably seemed necessary to avert such real or apparent danger. In addition to this he gave five special instructions requested by the defendant, and among them the following: "If you believe from the evidence that the defendant shot and killed Coley Clark, that at the time of the shooting Clark was in the act of taking the gun from his brother for the purpose of shooting the defendant or in such manner as to cause the defendant to reasonably believe it was for that purpose, that prior to said killing Clark had made threats against the life of the defendant, of which threats the defendant knew, and from the defendant's knowledge of such threats, if any, and from the acts of the deceased at the time of the killing, the defendant reasonably believed that it was necessary for him to shoot Clark in order to prevent Clark from killing him, and that he believed that danger to his life at the hands of Clark was present and imminent, and killed Clark by reason of such belief, and that a reasonably prudent and cautious man situated as the defendant was, and knowing what he knew, and seeing what he saw, would have believed and acted as the defendant did, then the court charges you that the defendant would be justified in his acts, even though you should further find that he was not in actual danger at the hands of Clark, and it would be your duty to find him not guilty.

The court charges you that the character of the deceased, Coley Clark, is a proper matter for your consideration, and you should consider it in connection with all the other evidence in the case, and should give it such weight as you deem proper in connection with the whole of the testimony, in determining or not the deceased at the time of coming to his death, acted in such a manner as to give the defendant as a reasonable, prudent and cautious man, reasonable cause to apprehend such danger of death or great bodily harm, at the hands of the deceased, as to justify the defendant in shooting the deceased on the ground of self-defense." We do not think the court erred in refusing the requested instruction. The terms used were not technical ones and needed no definition to enable the jury to apply them.

.The twenty-seventh assignment is as follows: "The court erred in permitting the state attorney, in his concluding argument before the jury, over the objection of the defendant's counsel, to read in the presence of the jury, a certain paper as the testimony of the witness, Callie Danford, before the coroner's jury, and to comment upon the statement contained in said paper as being her evidence before said jury and as going to impeach the testimony of said witness given upon the trial of this cause, when said paper so read over, had not been proven to be the evidence of the witness, Callie Danford, given at the inquest, nor had been admitted by her to her testimony given at the inquest aforesaid."

Callie Danford was a witness for the defendant, her father. She was asked by the state attorney on cross-examination, who read from a paper, if she did not make certain statements before the coroner's inquest, when her evidence was written down by Mr. Jim Lewis. Some of

these supposed statements she said she did not recollect making. Others she denied making, and among them that she said that "the boys were mad at Pap and he carried his gun," and again, "that she heard her father say that the Wadkins boys threatened to kill him and he was carrying his gun." No writing purporting to be her evidence before the coroner's jury was introduced in evidence to contradict the witness, and no witness testified as to what she did say at the coroner's inquest.

In the concluding argument of the case the state attorney stated to the jury that they could not believe the witness, Callie Danford, for the reason that at the inquest she had testified to a different statement of facts from that which she had testified to on the trial, that she had admitted on the stand that she testified at the inquest to the following, among other facts (reading from a paper which he then had in his hands as follows) : "I know Mrs. Wadkins and her boys  *  *  *  Papa said the Wadkins were going to kill him and he carried his gun with him." To this argument of the state attorney and his reading from this paper, the defendant objected on various grounds, particularly that this paper could not properly be used for the purpose of impeaching Callie Danford, or be commented on for that purpose. "The court ruled that the paper writing was not in evidence, and could not be used as evidence, but that the state attorney could refresh his memory from said paper as to what his recollection was of what Callie Danford admitted was her testimony at the coroner's inquest, stating that it was for the jury to say whether Callie Danford made such admission or not, and permitted the state attorney to argue that Callie Danford had admitted that her testimony at inquest was as he asserted, and to read

from the paper in his hands the matter aforesaid as being the matter he claimed Callie Danford had admitted as being the testimony at the coroner's inquest. The paper read from was the same paper which the state attorney read from in asking Callie Danford questions on cross-examination respecting her testimony at the coroner's inquest, to which several rulings the defendant did then and there object, an exception being taken to each ruling." It is perfectly clear from this record Callie Danford never did admit she stated at the coroner's inquest "that she heard her father say that the Wadkins boys threatened to kill him and he was carrying his gun." On the contrary she expressly denied making this statement and it was never legally proven that she did make such an admission. We are constrained to the opinion that the court erred in allowing the state attorney to urge before the jury as a proven fact, a supposed admission of Callie Danford tending to show premeditated design in her father in carrying his gun, when she had expressly denied making the statement imputed to her. The question involved was one of vital importance, and we are unable to say how far the jury were influenced by the use of this paper, purporting to contain Callie Danford's evidence at the inquest, and the argument which the state attorney based thereon, and particularly upon his assuming as a proven fact that which the record shows was not a proven fact, in order to impeach the testimony of Callie Danford before the jury. In Jenkins v. State, 35 Fla. 737, 18 South. Rep. 182, the court said: "Comments of counsel in arguing a case before a jury are controllable in the discretion of the trial court, but this discretion is subject to review and when counsel indulge in material statements outside of the evidence, and which are likely

to do the accused injury, it will be deemed an abuse of discretion 'when not stopped by the court· on objection made.". It is further said the objections made at the time, the ruling of the court thereon and exceptions to the rulings should appear in the bill of exceptions.

In the case of Killins v. State, 28 Fla. 313, 9 South. Rep. 711, it is said, pp. 336, 337: "Statements of facts not proved and comments thereon are outside of a cause; they stand legally irrelevent and are therefore not pertinent. If not pertinent they are not within the privilege of counsel." In Newton v. State, 21 Fla. 53, the facts were somewhat like those in the instant case. Mr. Wilson, an assistant of the state attorney, stated, in the presence of the jury, that a witness had. made to him a statement contradictory of that the witness had made on the stand. Mr. Wilson did not go on the stand as a witness, nor was his assertion proven by any witness. The court stated, "Counsel can make statement. It don't amount to testimony unless he takes the stand." Mr. Wilson disclaimed making the statement as testimony. P. 80.. On page 83 the court, speaking of the statement of Mr. Wilson, says: "It was improperly permitted and the court should have *stopped him from uttering* it, and advised the jury then and there that it was to have no weight or effect on their deliberations." The court should restrict the argument to the evidence in the case. Killins v. State *supra,* headnote, 2. If there had been any doubt about what Callie Danford did admit, then probably it· might have been left to the jury to determine from the evidence what her admissions were. People v. Mitchel, 62 Cal. 411. But the record before us is clear that she made no such admission as was claimed and argued by the state attorney. We are constrained to think this error was

not cured by the ruling of the court that the paper writing was not evidence in the case, and the state attorney could only use it to refresh his memory as to what Callie's admissions were. The state attorney used it so as to effect another purpose. He read it aloud to the jury under circumstances suggesting, though not proving, that it was a writing which contained her testimony at the inquest, taken down in writing by Jim Lewis. It conflicted with the testimony on the trial, and the argument based thereon by the state's representative was well calculated to impress the jury that Callie had contradicted herself, and that her testimony at the trial ought not for that reason to be believed. Clinton v. State, decided here at the present term. 1 Bishop's New Cr. Proc. Sec. 975-b-5; Smith v. People, 8 Colo. 457, 8 Pac. Rep. 920; Turner v. State, 4 Lea (Tenn.) 206; Sasse v. State, 68 Wis. 530, 32 N. W. Rep. 849; Laubach v. State, 12 Tex. App. 583; State v. Bulch, 31 Kan. 465, 2 Pac. Rep. 609; People v. Quick, 58 Mich. 321, 25 N. W. Rep. 302; People v. Ah Len, 92 Cal. 282, 28 Pac. Rep. 286; Fox v. People, 95 Ill. 71; People v. Treat, 77 Mich. 348, 43 N. W. Rep. 983.

The judgment is reversed at the cost of the County of Jackson.

TAYLOR and PARKHILL, JJ., concur;

SHACKLEFORD, C. J., and COCKRELL and WHITFIELD, JJ., concur in the opinion.