JIM O. McCALL v. STATE.
163 So. 38.
Division B.
Opinion Filed August 29, 1935.
Rehearing Denied September 21, 1935.

*Philip D. Beall, William Fisher* and *George W. Barrow,* for Plaintiff in Error;

Cary D. Landis, Attorney General, *Roy Campbell,* Assistant, and *E. Dixie Beggs,* State Attorney, for the State.

BUFORD, J.—The writ of error brings for review a judgment of conviction of murder in the second degree.

The indictment charged the defendant with the offense of murder in the first degree as principal in the second degree. It is the second appearance of the case in this Court. See McCall v. State, 116 Fla. 179, 14 156 Sou. 325. In that case we said:

"The record shows conclusively that plaintiff in error, McCall, if present at all, was constructively present and

that he did not actively participate in the homicide. These facts made it necessary for the State to prove beyond a reasonable doubt that the homicide was committed by Coy Strickland. To prove the guilt of Coy Strickland, the State relied upon circumstantial evidence and, therefore, before Jim O. McCall, the plaintiff in error, could have been properly convicted as a principal in the second degree, it was necessary that the circumstances proven to substantiate the guilt of Coy Strickland, when taken together, must be of such a conclusive nature and tendency leading on the whole to a reasonable and moral certainty that the person charged with having committed the homicide did commit the same and that no one else committed the offense. It is not sufficient that the facts create a strong probability of, and be consistent with, guilt. They must be inconsistent with guilt. They must be inconsistent with innocence. Parish v. State, 98 Fla. 877, 124 Sou. 444; Cannon v. State, 91 Fla. 214, 107 Sou. 360; Fall v. State, 90 Fla. 719, 107 Sou. 246; Asher v. State, 90 Fla. 75, 105 Sou. 140; Lee v. State, 96 Fla. 59, 117 So. 699; Davis v. State, 90 Fla. 816, 107 So. 245; Smith v. State, 101 Fla. 162, 133 So. 873; Simmons v. State, 99 Fla. 1215, 128 So. 486; Kennedy v. State, 31 Fla. 428, 12 So. 858; Gantling v. State, 40 Fla. 237, 23 So. 857; Pate v. State, 72 Fla. 97, 72 So. 517; Whetson v. State, 31 Fla. 240, 12 So. 661. Such evidence must be inconsistent with any reasonable theory or hypothesis of innocence. Buchanan v. State, 97 Fla. 1059, 122 So. 704. See Parish v. State, 98 Fla. 877, 124 So. 444."

Plaintiff in error contends that the judgment against him should be reversed because statements alleged to have been made by the alleged principal in the first degree, not in the presence of this defendant, were admitted in evidence; that it should be reversed because statements made by the

defendant at a time when he was not responsible because of his mental and physical condition were admitted in evidence against him and, third, because the prosecuting attorneys prosecuting the case argued to the jury that the statements made by the co-defendant of the accused not made in the presence of the accused constituted evidence of the guilt of the accused.

On the trial two written statements made and signed by one Coy Strickland who was jointly indicted with this defendant, Strickland being indicted as principal in the first degree, were offered in evidence. The first statement was in the following language, in the form of questions and answers, the questions being propounded by a detective named Erwin, to-wit:

"Q. When you boys went hunting you left those guns with the family living in the hollow about one-quarter of a mile from there?

"A. Oh, you mean we left the guns with the Welch boy, I don't remember which one; it was one of those Welch boys.

"Q. You left the guns there that morning?

"A. Yes, sir.

"Q. You and Brady Henderson, Henry Godwin?

"A. Caro Strickland, Homer Strickland and myself.

"Q. You went out there and pitched a big party?

"A. Yes, sir.

"Q. That evening you came by and picked up the guns and stopped at the service station across on the corner and Henry Godwin got out and walked home from there, did he not?

"A. Yes, sir.

"Q. Did Caro Strickland—he left you there also?

"A. No, sir, he left us before we got to the filling station.

"Q. You and Homer were the only ones remaining there?

"A. Yes, sir; Henry Godwin come on to town with us.

"Q. That was just about six; slightly after dusk?

"A. No, sir, we left home after six to go to—I asked my mother where H. B. was, my younger brother, and she said that he and a bunch of girls had gone to negro church, us white folks goes to negro church up there. So I asked my wife and my brother's wife to go to the negro church if it wasn't too late and the little girl brought the clock out on the porch and it was just straight up and down six o'clock. So we started out to the negro church and I seen one person as we went through town, Ellis Wind, and we went to the negro church and when we got there we found out there wasn't any so we come back and stopped at a cafe. There was a pretty good crowd standing around there and I asked Lola Jones did she have any oysters and she said have you heard the news and I said what news and she said old man Tom Spear was killed about ten minutes ago.

"Q. Where was that negro meeting supposed to be?

"A. About a mile west of Laurel Hill.

"Q. He told you that he wanted to cover that $400.00 check up?

"A. Yes, sir. As a blind. Here is something else he gave me a few days ago.

"Q. What was his object in giving you this, to cover things up?

"A. I suppose so. I couldn't figure out anything else.

"Q. The fact is you didn't owe him a darn cent?

"A. No, sir.

"Q. He has given you all this money?

"A. Yes, sir, he give me the money and he is either using me as a tool to get burned or thinks I did the killing.

"Q. And he did offer you $1000.00 to do the job?

"A. Yes, sir. He also offered Garrett Barker a $1000.00 to do the job, or it is said that he did.

"Q. And he did give you shells and the gun to do the job?

"A. Yes, sir, and he never did take the gun back. It is at my house now.

"Q. At your house now?

"A. Yes, sir.

"Q. What did Lance Hughes do up there when he got there after the crime was committed, what did he do towards finding out about it?

"A. Nothing that I know of.

"Q. Did Jim ever tell you anything that transpired between he and Lance Hughes?

"A. No, sir.

"Q. What did he say about he and Lance Hughes making a trip to New Orleans?

"A. Oh, he said they pitched a big party.

"Q. And he said he was with Lance Hughes?

"A. Yes.

"Q. How long was it after this killing that Jim McCall and Lance Hughes pitched this big party?

"A. I couldn't say.

"Q. It was shortly after the killing?

"A. Yes, sir.

"Q. Has Jim ever implied to you at any time that Lance Hughes was getting his to keep quiet?

"A. No, sir, he never has.

"Q. Didn't Lance Hughes often go over there and get money from Jim?

"A. I couldn't say.

"Q. The morning of the killing, you went up to Spear's house and got a gun. Who gave you that gun, Coy?

"A. You mean on Monday morning?

"Q. Yes.

"A. I didn't get no gun when we went hunting, he give me a gun.

"Q. Say 6:30 you was back in town?

"A. I think it was before 6:30.

"Q. 6:20?

"A. Well, about that time.

"Q. It was something about like that?

"A. Somewhere around 6 or 6:20.

"Q. That would give you plenty of time?

"A. Yes.

"Q. Who did you see around there when you come back by?

"A. This fellow Wind and Lola Jones.

"Q. They were in the restaurant?

"A. No, sir, they were in front of the restaurant.

"Q. Have you got anything further to say in reference to the killing?

"A. No, sir.

"Q. And you didn't know anything about this killing until Lola Jones told you about it?

"A. No, sir.

"Q. When you come up from your house you come straight up the dirt road and cross over the track?

"A. Yes, sir.

"Q. And when you came back you came straight into Jones' restaurant on the highway?

"A. Yes, sir.

"Q. I think that will be all."

The other statement was as follows:

"Well, about two weeks before Mr. Spear was killed I went in Mr. McCall's store and he asked me—I don't remember what I went in there for, probably cigarettes, and he called me in the back of the store and give me a drink of whiskey and asked me if I would like to make a $1,000.00, and I told him yes, certainly, why? And he said for me to kill old man Tom Spear and I will give you $1,000.00. And I said quit trying to hand me that stuff, or something to that effect, and I told him I would see him later. So a few days later, he come to my house, him and a fellow by the name of Ellis Wind, and asked me to go bird hunting with them. I went bird hunting with them and killed some birds and come back to my house, stopped to take the birds out. And he brought a gun along for me so he left the gun. We counted the birds and he said just to keep this gun until the end of the season which I did. So he goes on. He asked me that day we were hunting if I was going to pull that job. While we were hunting some way or other Ellis Wind, the boy who was hunting with us, got away from us and he walked up to me and handed me three shells, 3 D's, I think, buck shot shells. We counted the birds after we got back. He told me to keep the gun as there was just a few days more of hunting season so he said. I asked him a couple of days later if he didn't want me to bring his gun up to the store and he said no, just keep it until the end of the season.

"So he asked me sometime during that week if I was going to do that for him; kill old man Tom Spear is what he meant, but he didn't say that. I told him I would let him know. So I didn't talk to him any more and so on Sunday night old man Spear was killed, and as far as knowing who killed him I couldn't say.

"Well, I passed him on the street one day the next week

or the same week old man Spear was killed and he put $100.00 in my hand and I turned around and asked him what this was for and he said you know what it is for but didn't give me a chance to talk with him. Well, he kept passing me on the street and handing me money in the streets to the amount of $600.00. One day he asked me didn't I want a home here in Laurel Hill. I said I didn't mind it and he said all right pick you out one. I had heard my brother talk about wanting to sell his place so I goes to my brother and asked him what he would take for the place and he said what do you care, what have you got to buy a place with. So it rocked on a couple of days, and I asked him again and he said, "Where are you getting money to spend anyway?" I said, "Oh, I am a bootlegger." I asked him exactly how much he would take for his place. He said, well I have a school bus, good truck. I make $78.00 a month for two hours work per day, he says, I will take $400 for this place, extra lot and a truck. I said come on down to the store with me. We went to Jim McCall's store and he wrote a check for $400.00. And he says for a blind you better make me a mortgage on this place so we goes over to a notary public and me and my wife signs a mortgage; and there was some other mortgage made up on household stuff. I couldn't say just what that was though."

The court admitted all of the first statement except the following:

"Q. What was his object in giving you this, to cover things up?

"A. I suppose so. I couldn't figure out anything else.

"Q. The fact is you didn't owe him a darn cent?

"A. No, sir.

"Q. He has given you all this money?

"A. Yes, sir, he give me the money and he is either using me as a tool to get burned or thinks I did the killing.

"Q. And he did offer you $1,000.00 to do the job?

"A. Yes, sir, he also offered Garrett Barker a $1000.00 to do the job, or it is said that he did.

"Q. And he did give you shells and the gun to do the job?

"A. Yes, sir, and he never did take the gun back. It is at my house now.

"Q. At your house now?

"Yes, sir.

"Q. What did Lance Hughes do up there after the crime was committed, what did he do towards finding out about it?

"A. Nothing that I know of.

"Q. Did Jim ever tell you anything that transpired between he and Lance Hughes?

"A. No, sir.

"Q. What did he say about he and Lance Hughes making a trip to New Orleans?

"A. Oh, he said they pitched a big party.

"Q. And he said he was with Lance Hughes?

"A. Yes.

"Q. How long was it after this killing that Jim McCall and Lance Hughes pitched this big party?

"A. I couldn't say.

"Q. It was shortly after the killing?

"A. Yes, sir.

"Q. Has Jim ever implied to you at any time that Lance Hughes was getting his to keep quiet?

"A. No, sir, he never has.

"Q. Didn't Lance Hughes often go over there and get money from Jim?

"A. I couldn't say."

And admitted all of the second statement, but, under in-instructions, as follows:

"Gentlemen, certain evidence has been offered by the State in the form of documents, which will be read to the jury. This evidence is introduced solely to furnish light upon the guilt or innocence of Coy Strickland described in the indictment under which the defendant is now on trial. You understand that Coy Strickland is not on trial but in the State's proof it is necessary to prove that Coy Strickland, named in the indictment, was the principal in the alleged homicide, and the evidence which is about to be read to you is admitted solely for the purpose of throwing light upon the guilt or innocence of Coy Strickland, and cannot and must not be considered by the jury as affecting the guilt or innocence of the defendant now on trial, Jim O. McCall. You will pay particular attention to this part of the charge, for it is wholly inadmissible for any purpose as relating to the guilt or innocence of Jim O. McCall. It is a statement purporting to have been made by Coy Strickland, who is not on trial, and made out of the presence of Jim O. McCall, and would, under no circumstances be admissible against him. It would not be right or just for the jury to consider it as evidence against Jim O. McCall, who was not present and had no opportunity to hear it, and no opportunity to deny it. Under those circumstances, the testimony is inadmissible as against the defendant who is now on trial. So you will pay particular attention to this charge, and keep your minds in that condition—you will not permit the testimony to influence you in any way as against the defendant, Jim O. McCall. It is admitted solely for the purpose of throwing light upon the guilt or innocence of Coy Strickland."

Other witnesses testified that Coy Strickland, soon after

the homicide was committed, exhibited large rolls of money; that he was not accustomed to having money in his possession; that he accounted for his possession of the money by saying that he had won it gambling. In each instance the court charged the jury that such testimony could not be considered as establishing the guilt of the accused McCall but was only admissible for the purpose of tending to establish the guilt or innocence of Coy Strickland.

The record further shows that Coy Strickland was put on the stand by the defendant and was questioned in regard to the signed statements which were introduced in evidence. So the defense had the opportunity of cross-examining him about those statements in the presence of the jury.

It is further contended that the written statements signed by Coy Strickland were made under such duress as to make them inadmissible as against him. Whether or not they were made under duress and, therefore, whether or not admissible was a question for the trial judge to determine subject to review in case of abuse of his discretion. The evidence as to whether they were or were not made under duress is conflicting but the trial judge decided and held that they were admissible in evidence.

We do not think that an abuse of discretion in admitting such testimony is clearly shown insofar as that admissibility applies to the determination of the guilt or innocence of Coy Strickland. However, Coy Strickland was not on trial. Had he been on trial, then he might have had certain rights to be determined by the court which are not involved in this case. Therefore, this holding does not necessarily mean that the statements as submitted and admitted in evidence would be held to be properly admitted against Coy Strickland, had he been on trial.

Assuming that the statements were admissible for the pur-

pose for which they were offered, we think that they are pertinent and tend to prove the guilt of Coy Strickland of the offense charged.

It is well settled that where an indictment charges two persons with the crime of unlawful homicide, one of them being charged as principal in the first degree and the other as principal in the second degree, the person charged as principal in the second degree may be put on trial and may be convicted before the trial of or the conviction of the principal in the first degree and this may be done, although the principal in the first degree has been acquitted of the charge. See Rooney v. U. S., 203 Fed. 928, 122 C. C. A. 230; U. S. v. Hughes, 34 Fed. 732; U. S. v. Libby, 26 Fed. Case. No. 14,597; Jones v. State, 64 Ga. 697; State v. Lee, 91 Iowa 499, 60 N. W. 119; State v. Anderson, 89 Mo. 312, 1 S. W. 135; State v. Whitt, 113 N. C. 716, 18 S. E. 715; State v. Fley, 4th S. C. L. 338, 4 Am. Dec. 583.

The record of the conviction of the person charged as principal in the first degree is admissible in evidence on the trial of the person charged as principal in the second degree, but it is only *prima facie* evidence and not conclusive evidence of such guilt on such trial. Studstill v. State, 7 Ga. 2; Tuttle v. State (Tex. Cr.) 49 S. W. 82; Coxwell v. State, 66 Ga. 309.

By the former opinion and judgment in this case above referred to, we have placed ourselves in line with those states which hold:

"Where person charged with murder as principal in second degree was only constructively present, proof must be of conclusive nature and tendency leading to reasonable and moral certainty that person charged with having committed homicide and no one else committed offense, and it

is not sufficient that facts create strong probability of, and be consistent with, guilt."

The rule stated in 16 C. J. 141, and to which we find no contradiction, is:

"In some jurisdictions it is not necessary in order to convict a principal in the second degree, to prove the guilt of the principal in the first degree and it has, therefore, been held error to admit in evidence the conviction of the latter. In other jurisdictions it has been held necessary to establish the guilt of the principal in the first degree, and as a general rule any evidence which would have been admissible in a prosecution of the principal in the first degree is admissible to prove his guilt, * * *"

. And so we hold there was no reversible error committed by the court in admitting the written statements of Coy Strickland, nor in admitting the evidence adduced from other witnesses as to statements made by Coy Strickland and in regard to his exhibiting large rolls of money soon after the homicide was committed when such statements were admitted under the very clear and definite instructions by the court that they were admitted solely for the purpose of tending to establish the guilt of Coy Strickland, and could not be considered as evidence tending to establish the participation of McCall in the alleged homicide. If such statements should be held to be improper because not made in the presence of the accused on trial, such holding would result from the principle of law that the accused has the right to be confronted with the witnesses against him and to cross-examine them. Therefore, when the record shows, as it does in this case, that Coy Strickland was present in court, that he was put on the stand and questioned in regard to those statements the defense had the right to

examine him fully in regard to the truth or fallacy which were offered in evidence.

As to the next contention that the evidence as to statements made by the accused McCall sometime after the homicide was committed and while he was in a hospital recuperating from an attack of delirium tremens caused from excessive drinking, were inadmissible because it is not shown that he was in a mental or physical condition to realize the purport of what he was alleged to have said, we find from the record that the evidence as to what his condition was is conflicting, but the record does not disclose that the trial judge abused his discretion in admitting in evidence those statements of the accused made at such time.

The record is sufficient to sustain the conclusion that the accused was sufficiently cognizant of what he was doing and sufficiently mentally responsible to be held accountable for those statements in which it was shown by the evidence that he stated that he was responsible for the death of the deceased.

We come now to the third contention of the plaintiff in error and that is, that reversible error occurred by reason of the States attorneys prosecuting the case contending in the arguments before the jury that the extra-judicial statements in writing made by Coy Strickland tended to establish the guilt of McCall. The record shows that the trial judge had already instructed the jury that they could not consider these statements as in any degree establishing the guilt of McCall.

The bill of exceptions shows the following:

"Whereupon in the course of the argument the State's attorney made the following statement to the jury:

"In the very paper that Coy Strickland dictated while he was in jail in DeFuniak Springs, he told that the mortgage

was given as a blind; that paper in which he called in Miss McPhail to his aid; that makes $1000.00 paid to Coy Strickland. Coy says—and this is only admissible as far as Coy is concerned, while he was in jail at DeFuniak, that Jim offered him $1000.00 to do it, and that he was actually paid $1000.00. After the death of Mr. Spear, Mr. McCall enjoyed great liberties in drinking and .smoking, and had under his control and command all the business, refusing to account to Mrs. Spear.

"To the making of which statement by the State's attorney the defendant then and there took exception, on the grounds that the said statement was an unauthorized and invalid use of the Coy Strickland statement as evidence against the defendant, McCall.

"Whereupon in the course of his argument, Judge Kelly, for the State, made the following statement ·to the jury:

"We know about how that place was juggled by these boys; you can see that here—here's the thing that counts for that place. I want to read you this; this thing says: 'Well about two weeks before Mr. Spear was killed, I went in McCall's store'—where was it McCall called Garrett in?—in ·the store, back in the store where there would be no detection, or anything to tell the tale—'And he asked me—I don't remember what I went in there for, probably cigarettes—and he called me in the back of the store'; Where has he been a hundred times since Mr. Spear was killed—in the back of the store. 'Called me in the back of the store and gave me a drink of whiskey,'—you know it is amusing to see how people try to hide behing doing things from whiskey; they seem to think they can come out and do anything, if they've got whiskey behind them to justify them in doing it . 'And he asked me if I would like to make a thousand dollars.' What did he say to Garrett? ·Remember, at the

time this was made he had never heard Garrett testify, nor had Garrett heard him testify anything; but he says the same thing to Coy Strickland that he said to Garrett; 'I told him, yes, certainly, why, and he said for me to kill old man Tom Spears and I will give you $1,000, and I said quit trying to hand me that stuff, or something to that effect and I told him I would see him later. So a few days later he came to my house, him and a fellow by the name of Ellis Wynn, and asked me to go bird hunting with them. I went bird hunting with them and killed some birds and came back to my house, stopped to take the birds out. And he brought a gun along for me, and so he left the gun. We counted the birds and he said just to keep this gun until the end of the season, which I did; so he goes on. He asked me that day we were hunting if I was going to pull that job. While we were hunting some way or other Wynn, the boy who was with us, got away from us and he walked up to me and handed me three shells, 2 D's I think buck shot shells. We counted the birds after we got back. He told me to keep the gun as there was just a few more days of hunting, the season would be over soon. I asked him a couple of days later if he didn't want me to bing his gun up to the store and he said No, just keep it till the end of the season. So he asked me sometime during that week if I was going to do that for him—kill old man Spear is what he meant, but he didn't say that. I told him I would let him know, so I didn't talk to him any more, and so on Sunday night old man Spear was killed and as far as knowing who killed him I couldn't say.' Now, gentlemen of the Jury, there it is, the thing happened; he had to do the same business, the same proposition that Jim had made to Garrett, here it is, 'and so on Sunday night old man Spear was killed. Well, I passed him on the street one

day the next week—that was the week after the Sunday Mr. Spear was killed—now, listen and see what happened: 'or the same week old man Spear was killed, and he put $100 in my hand, and I turned around and asked him what this was for, and he said, 'You know what it is for,' but didn't give me a chance to talk with him. Well, he kept passing me on the street and handing me money in the streets to the amount of $600—$600, gentlemen—'One day he asked me didn't I want a home in Laurel Hill. I said I didn't mind it and he said 'all right, pick you out one.' " Now, gentlemen, there is some evidence there—we have found the juggling of the house between them—gentlemen, you go back a moment—you find that he got this house— he says in his statement; that's as far as I can read—you gentlemen read it—that the mortgage was taken as a blind.

"To the making of which statement, the defendant, by his attorney, then and there took exception, because said argument used a part of the statement of Coy Strickland as part of the case against the defendant, McCall, and as proving the facts as stated against the said defendant, McCall.

"Whereupon the court made the following statement to the jury:

"Gentlemen: Those remarks that counsel for defendant has called to your attention, you will wholly disregard in your consideration of the case, and you will not consider the argument of counsel. Counsel for the State has no justification—I am sure he did it unintentionally—it is a little confusing to keep them straight, keep them separate— but you will not draw any conclusions against Jim O. McCall from the statements made, or from the statements admitted in evidence against Coy Strickland. You will not consider or draw any inference or conclusions against Jim O.

McCall from that statement. In other words, it is not permissible for the State to argue any conclusions or inferences from that statement as to the guilt of Jim O. McCall, or as evidence against Jim O. McCall any statement contained in that written statement signed by Coy Strickland. It is unfair and unjust to use the statement of Coy Strickland in considering the guilt or innocence of Jim O. McCall. You will disabuse your minds of any statement made by counsel for the State who sought to draw inferences against Jim O. McCall from that statement."

. Now, it is true that the trial judge did what he could to correct the improper arguments presented, but it occurs to us that he "locked the stable after the horse was gone." The harm had been done. This testimony that was only admissible for the purpose of tending to prove that Coy Strickland fired the fatal shot had been used by the State, not only for the purpose of going to show that Coy Strickland fired the fatal shot, but also to show that the accused McCall procured and hired Coy Strickland to fire the fatal shot and it was necessarily impressed upon the jury, the judge's instruction and charge to the contrary notwithstanding, that here was concrete evidence of the participation of McCall in the murder of the deceased Spear.

In the case of Danford v. State, 53 Fla. 4, 43 So. 593, Mr. Justice Hocker, delivering the opinion of the Court, quoting with approval from Jenkins v. State, 35 Fla. 737, 18 So. 182, said:

"Comments of counsel in arguing a case before a jury are controllable in the discretion of the trial court, but this discretion is subject to review, and when counsel indulge in material statements outside of the evidence, and which are likely to do the accused injury, it will be deemed an abuse of discretion when not stopped by the court on objection

made.' It is further said the objections made at the time, the ruling of the court thereon and exceptions to the rulings should appear in the bill of exceptions."

. Further in the same case it is said:

"In the case of Killins v. State, 28 Fla. 313, 9 South. Rep. 711, it is said, pp. 336, 337: 'Statements of facts not proved and comments thereon are outside of a cause; they stand legally irrelevant and are therefore not pertinent. If not pertinent they are not within the privilege of counsel.' In Newton v. State, 21 Fla. 53, the facts were somewhat like those in the instant case. Mr. Wilson, an assistant of the state attorney, stated in the presence of the jury, that a witness had made to him a statement contradictory of that the witness had made on the stand. Mr. Wilson did not go on the stand as a witness, nor was his assertion proven by any witness. The court stated, 'Counsel can make statement, it don't amount to testimony unless he takes the stand.' Mr. Wilson disclaimed making the statement as testimony. P. 80. On page 83 the court, speaking of the statement of Mr. Wilson, says, 'It was improperly permitted and the court should have *stopped him from uttering it* and advised the jury then and there that it was to have no weight or effect on their deliberations.' The court should restrict the argument to the evidence in the case. Killins v. State, *supra,* headnote 2. If there had been any doubt about what Callie Danford did admit, then probably it might have been left to the jury to determine from the evidence what her admissions were. People v. Mitchell, 62 Cal. 411. But the record before us is clear that she made no such admission as was claimed and argued by the state attorney. We are constrained to think this error was not cured by the ruling of the court that the paper writing was not evidence in the case, and the state attorney could only use it to

refresh his memory as to what Callie's admissions were. The state attorney used it so as to effect another purpose. He read it aloud to the jury under circumstances suggesting, though not proving that it was a writing by Jim Lewis. It conflicted with the testimony on the trial and the argument based thereon by the state's representatives was well calculated to impress the jury that Callie had contradicted herself, and that her testimony at the trial ought not for that reason to be believed. Clinton v. State, decided here at the present term."

In Berger v. United States of America, 79 Law. Ed. 667, Supreme Court of the U. S. advance sheet, April 15, 1935, the Supreme Court of the United States, speaking through Mr. Justice Sutherland, said:

"The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the two-fold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

"It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt

to carry much weight against the accused when they should properly carry none."

He cites People v. Malkin, 250 N. Y. 185, text 201-202; People v. Sesposito, 234 N. Y. 370, text 375, 377; Johnson v. U. S., 215 Fed. 679, text 685; Cook v. Commonwealth, 86 Ky. 663, text 665-667; Gale v. People, 26 Mich. 157; People v. Wells, 100 Cal. 459. See also People v. Bowers, 79 Cal. 415.

The rule appears to be that when a prosecuting attorney has indulged in improper argument the question is whether or not the court can see from the record that the conduct of the prosecuting attorney did not prejudice the accused and unless this conclusion can be reached the judgment must be reversed.

It appears to us that the argument of the prosecuting attorney in this case was necessarily prejudicial to the accused. It assumed the existence of evidence against the accused which did not exist in the record as against him. If Coy Strickland had gone on the stand and testified that the accused did agree to give him $1000.00 to kill Mr. Spear and did thereafter pay him $1,000.00, that evidence would have been admissible and would, if believed by the jury, constitute most convincing evidence of the guilt of the accused. But, that was not the condition which existed and the state's attorneys were not authorized to argue the extra-judicial statement of Coy Strickland the same as if it had been evidence given at the trial by Coy Strickland.

And so the judgment must be reversed.

It is so ordered.

Reversed.

ELLIS, P. J., and TERRELL, J., concur.

WHITFIELD, C. J., and DAVIS, J., concur in the opinion and judgment.