## JOE, A PERSON OF COLOR, VS. THE STATE.

1. In case of a charge of poisoning, chemical tests and analysis of the contents of the stomach and bowels are essential to the ascertainment of the truth, and should be resorted to in all cases where there is no direct proof of the act.
2. Symptoms of themselves, without other circumstances, are not reliable, and cannot be regarded as conclusive evidences of guilt.
3. A new trial will be granted where there is evidence of symptoms alone, and those imperfect, no tests to ascertain the presence of poison, none discovered or traced to the prisoner and motive or other fact proved to induce the presumption of guilt.

Appeal from Leon Circuit Court.

Joe, the Appellant was indicted for administering to a female slave named Rebecca, white arsenic or poison.

The prisoner pleaded not guilty, and on the trial, the woman, Rebecca was examined on the part of the State who testified that whilst she was cooking breakfast at a fire out of doors at which prisoner was also cooking, he, the prisoner handed her a small breakfast plate containing some beef haslet which he had been cooking and asked her to eat some. She eat about six mouthfuls of it, and immediately afterwards felt a pain in the heart. She also felt as if she wanted to vomit, but could not then—but felt as if she was going to die. She commenced vomiting about eleven o'clock—was blind when the " misery was on."—She had great pain in the breast, then all over. She had painful and bloody discharges from the bowels the same day that she eat the food handed her by the prisoner. She was friendly with the prisoner. Had not been sick before.

Dr. Miles Nash was also examined for the State, who testified that he was called in as a physician to see Rebecca on the second day after she had taken something. Des-

cribes the situation of the patient—frequent vomiting and discharges from the bowels, both tinged with blood—legs partially paralized—great tenderness about the stomach. Witness is of opinion that these effects were produced by taking arsenic into the stomach. The case exhibited specific symptoms of disease producee by arsenic. Innocent medicines could not produce such effects. There were no analytical or chemical tests applied to ascertain the presence of arsenic. There are some symptoms produced by arsenic that may be found in other cases where the disease proceeds from other causes.

The prisoner offered several witnesses to testify to his former good disposition.

A verdict of guilty having been rendered, the prisoner by his counsel applied for a new trial on the following grounds, viz : First that the verdict was based upon vague and inconclusive evidence as to the nature and quality, as well as to the administration of the substance or thing alleged to be poisonous ; the insufficiency consisting in a want of any analytical or chemical tests applied for the purpose of detecting the presence of poison, either to the matter discharged from the stomach, or to the food remaining in the plate in which the food was offered to the sufferer.

2d. The similarity of the symptoms to those produced in other cases from remedial agents, and innocent medicines, or from purely natural causes.

3d. The intent to kill cannot be inferred from the administration of an article not proved to be deadly.

4th. Newly discovered evidence to contradict the testimony of Rebecca as to the degree of her illness, and to prove by a witness that she herself partook with impunity of the food from the same pot at the same time.

5th. The general good disposition of prisoner, and the

absence of evidence of general or special malice, independently of the act alleged, and the want of evidence of adequate motive.

6th. The absence of prisoner's original counsel, the counsel who defended the prisoner not having been appointed until the morning of the trial.

7th. The status and condition of the prisoner whose ignorance almost wholly incapacitated him from affording his counsel any intelligent or useful information in the conduc of the case.

The Court having refused a new trial, the prisoner by his counsel appealed.

*A. L. Woodward*, for Appellant.

### PROPOSITIONS ON THE MERITS.

I. In criminal jurisprudence, upon the plea of *not guilty*, the accused being deemed innocent in the eye of the law, this presumption is sufficient, in all doubtful cases, to turn the scale in his favor. Neither preponderance of evidence, nor any weight of preponderant evidence, can be considered proof of guilt, unless it establish beyond all reasonable doubt the fact alleged and generate entire belief and conviction of the truth of the charge—*the intent and malice averred.*

II. It is not enough that the evidence tends to show the guilt of the accused; it must be inconsistent with any reasonable supposition of his innocence.

III. Where the act, *per se*, constitutes the crime, the fact alleged as the *corpus delicti* must be proved by evidence amounting to demonstration.

In cases of poisoning, the article, substance or thing alleged to be poisonous in its nature must, be *proved to be so*, and the fact that it was prepared, exhibited or administered by the prisoner must be established by incontro-

vertible evidence. Otherwise, neither can malice be imputed nor the intent charged be inferred. Evidence of sensations and symptoms which the patient and physician describe is not sufficient to authorize a verdict of conviction, such evidence not being, in this class of cases, uniform and consistent indications of the fact alleged, viz: *the presence of poison*, and, therefore, uncertain, unreliable and delusive.

IV. Adequate intelligence, knowledge and capacity in the accused, possession of the instrument or means of the crime alleged, opportunity, occasion and facilities for the use, some probable *motive* to the consummation of the act, or malicious purpose in its execution, must be satisfactorily shown, either by previous conduct, disposition or declarations evincive of animosity, mischief or ill will. And the good character of the prisoner, in reference to the disposition or trait of character in issue, and the good terms or friendly relations subsisting between the parties, are admissible in evidence to repel the charge of criminal intention. Authorities: 3 Greenleaf Evidence, p. 29, § 29, p. 125, § 135, p. 25, § 25, Notes; 1 Starkie on Ev., p. 567–70–72–74; 2 Starkie on Ev., 675–76, 691, 719. Medical authors: Hooper's Med. Dic.; 2 Dunglesson's Med. Dic.; 2 Beck's Medical Jurisprudence, pp. 276–77, 285–86–88; Diseases similar to effects of poison, 297, 298; Arsenic, 368–71 to 73, (note;) Tartaremetic, 460–61. Taylor's Med. Juris., pp. 44, 45, 79, 80, 114–15–17, 131–32, 159–60. Law Library, vol. 33: Wills on Circumstantial Evidence, pp. 20 to 22, 27 to 30, 32, 68, 69, 70 to 81; Cases on Poisoning, 87 to 96; Wharton's Criminal Law, 389–90 to 93.

PROPOSITIONS ON NEW TRIAL.

I. A new trial will be granted if the verdict be against evidence on any material point, or be not based upon sufficient evidence to sustain it, especially where the evi-

dence on which the verdict is founded is not the species or degree of evidence which the law in such a case would require.

II. New trial will be granted on the ground of newly discovered evidence, where such was previously unknown, if such be material to the issue or would probably have had an influence on the verdict, either by proving distinct contradictory facts, part of the *res gestæ*, or by otherwise rendering doubtful the evidence adduced by the State on the trial.

III. New trial will be granted for error in the instructions of the court, whether in reference to the rules of evidence or *the law upon the subject-matter of the case;* and this, though the instructions be strictly correct so far as given, yet, if they be not sufficiently definite, explicit and full, or tend to create an erroneous impression on a material point, or to mislead the jury, or to induce misapprehension or mistake and a wrong or false estimate of the comparative weight and value of the evidence.

IV. Where proof of the *corpus delicti* consists entirely of *circumstantial evidence*, every material circumstance must be satisfactorily established, no inference being legitimately deducable from such evidence, unless the circumstances be either separately or concurrently conclusive, and inferences such as the evidence may fully authorize.

V. The trial must have been deliberate, full and fair—not pressed, urgent, hurried or imperfect. There must have been ample time for the preparation of the defence, both in ascertaining evidence, summoning witnesses and inspecting the venire, and for the preparation of counsel on evidence and law, especially where, from the *social status* and *condition* of the prisoner and the position of his counsel, newly appointed by the court, no want of diligence could, under the circumstances, be reasonably attributed to either.

VI. Courts are more liberal in granting new trials in criminal than in civil causes, both from the vast difference of the rules of evidence in comparative weight and degree in the respective forums, and from the difference in the importance and value of the stake involved, which is immeasurable both to the prisoner and the country. Authorities : Graham on New Trial ; Wash. Cir. Ct. Rep.; Hammond vs. The State, 5 Strobh. Law, 91, 100 ; Bedford vs. The State, 5 Humph., 552 ; Copeland vs. The State, 7 Humph, 481–82–83 ; Cochrane vs. The State, Ib. 544–45–46–47 ; Troxdale vs. The State, 9 Hump., 411 ; Garland vs. The State, 2 Swann, 18, 20, 21, 22, 26 ; Nelson vs. The State, Ib., 261–62; The State vs. Dow, 19 Conn., 388–91–92–93 ; 8 S. & M., 401, 417.

## ARGUMENT.

The indictment rests on three predicates, upon every one of which the State is bound to offer a satisfactory affirmative solution.

I. That the article, substance or thing alleged to have been administered was of a poisonous, deadly and destructive nature.

II. That it was administered by the prisoner.

III. That it was administered by him, knowing its nature or quality, " with intent to kill."

To controvert these premises, the plaintiff in error assumes these general propositions, viz:

I. That the poisonous, deadly and destructive nature of the article or substance alleged to have been administered was not satisfactorily established in evidence.

II. That the *effect* which the charge imputes not having been produced, the *intention* cannot be inferred without sufficient evidence of the prisoner's *knowledge* of the poisonous, deadly and destructive nature of the article or sub-

stance alleged to have been administered, the effects or consequences proved not affording a conclusive presumption of such knowledge.

III. That, therefore, if the article or substance administered were poisonous in its nature, it may be presumed to have been given in ignorance of such quality, and thus the criminal intention is repelled.

IV. That even if the prisoner was aware of the poisonous quality of the article, it was administered in such an infinetismal dose that a fatal purpose cannot be presumed.

V. That an innocent medicine—tartaremetic for instance—would produce similar symptoms or effects, and thus a presumptive criminal intention is negatived.

VI. That the food itself, from its quality, condition and mode of cooking, might or probably would produce like effects, and may therefore be assigned as *the sole and exclusive exciting cause.*

VII. That the entire absence of any probable *motive*, the good character of the prisoner as to the disposition or trait in issue, and the good terms subsisting between the parties, negative any presumption against him in the absence of proof of the *corpus delicti.*

Upon these propositions the counsel contended that analytical or chemical tests afford the only safe, sufficient, satisfactory and reliable evidence in cases of poisoning, and that evidence from sensations and symptoms in this class of cases, being assimilated to those produced and exhibited by the administration of innocent medicines, or from other and simply natural causes, are apt to be mistaken and confounded. Therefore, where symptoms exist alike in different diseases, they cannot consistently and beyond reasonable doubt be asserted or assumed to be distinctive of, or peculiar, or exclusive to *any particular one.*

And finally, that where the mechanical coincidences or

physical and scientific evidences are defective, these being essential to, and constituting proof of the *corpus delicti*, they cannot be supplied by moral coincidences alone, these being merely *corroborative and supplemental* in their character and legitimate effects ; and where the moral evidence *is itself defective* there is no basis remaining on which a verdict of conviction can be sustained.

The counsel also contends, that the instructions of the Court are exceptionable and defective, not being sufficiently explicit and full, and in requiring exculpatory evidence *to be exclusively adduced by the prisoner*, omitting the important addenda and modification, that it may arise or be deduced from the evidence on the part of *the State*. And farther, that the instructions are also exceptionable in ruling that the *quantity* and *quality* of the article or substance, alleged to be poisonous, is immaterial in evidence, or not necessary to be proved, for as the counsel contends, this rule applies only in cases where the effect is *fatal* in its termination, and that such a rule is of no force in a case where the sufferer survives. In the one case the effect being produced, it may be unnecessary to inquire into the *extent* or *degree of its cause*, whereas, in the other case, *ex. gr.*, the one pending, the nature, quality, exent or degree of the cause of certain effects and certain consequences, is the very question to be solved, the main issue presented, and of course *the exclusive subject matter of judicial investigation*, for it is upon this, that the question of *malice and intention depend*, and these are of the essence of the crime.

And lastly, that the *social status* or grade, and the friendless condition, as well as the ignorance and mental infirmity of the prisoner, *and the peculiar circumstances* under which the trial took place, are such, that a new trial ought to be awarded.

*The Attorney General* for the State.

BALTZELL, C. J., delivered the opinion of the court:

This is an appeal from a conviction and sentence of death, passed upon the prisoner Joe on a charge of having administered poison and white arsenic to a negro woman, Rebecca. She did not die from the alleged effects, but is examined as the only witness to the facts of the case, excepting the medical attendant.

But little complaint is made of the instructions given to the jury, which seem to have been drawn with exceeding care and caution on the part of the Judge below, and are, on the whole, liberal to the prisoner. Reliance is placed in this court on the motion for a new trial presented to and overruled by the court below, and the broad position assumed that the facts of the case do not establish a case of guilt.

It is rather a singular circumstance that new trials were never granted until within a recent period in England, in cases of felony, this object being in some degree attained by the Judge reserving a point of difficulty for the decision of the court above. The courts of this country have maintained a different practice, even granting a new trial where the case was either against the weight of evidence or not sustained by it. Appeals are not often allowed in criminal cases, and, if permitted, the assignment of error is usually confined to questions of law. In this State, the appeal is not only allowed, but the duty is imposed upon the court of examining into the correctness of the ruling as to the refusal of a new trial.

The crime of poisoning is of so shocking a character—so revolting to every sentiment of our nature—so far exceeding all others in atrocity—that we have not been able to yield a willing ear to the accusation, or to admit it with

ready facility. If true, the punishment of the law would not be by any means too severe. With a due sense of its importance, as well to the public as to the prisoner, not at all diminished by the fact that the individual implicated is a free man of color, we approach the consideration of the subject.

The cases to be found in the books, both medical and legal, exhibit abundant evidence of the absence of proper skill and acquaintance with the subject, creating the fearful impression that many, very many, innocent persons have been sacrificed to prejudice and ignorance rather than to actual guilt.

Modern Science with its pervading power has removed this difficulty by substituting certainty in place of the obscurity that has so long prevailed. To the Philosopher, the man of Science, and Physician, the world is indebted for important aid in judicial investigations, through means of chemical tests applied to matter ejected from the stomach and bowels and to the different parts of the body. A remarkable instance of the certainty attending such an examination is given in the Edinburgh Medical Journal of Science as having occurred in Paris. The head, trunk, and two lower extremities of a man were found in different and distant parts of the city, and were subjected to the scrutiny and examination of Physicians, who applying to them the results of science and skill, came to the conclusion that the individual was killed during sleep—a sleep induced by artificial means, that this was the result of drunkenness or the effect of some narcotic; that the throat must have been cut and an immense quantity of blood lost—that the decapitation and cutting off of the limbs must have been immediately performed by a person accustomed to such operations. That the instrument was sharp edged and long, that the person commtting the act must have been a vigo-

rous person, and the incisions made by the same hand, but the murderer became nervous at the close of the deed.

They then examined the internal parts and came to the conclusion that the deceased labored under no disease. In examining the contents of the stomach, they found a small quantity of alchohol and prussic acid. A few weeks afterwards, the murderer delivered himself up and confessed, confirming in a remarkable degree these various opinions of the Physicians. Wills on Circumstantial Ev., 244.

The German and French authors on medical jurisprudence, hold that poisoning can never be completely established unless the particular poison be found; a doctrine not adopted in English jurisprudence. Wills, 215, 16.

Yet this accomplished, author says—"Upon general principles it cannot be doubted that Courts of Law would require chemical evidence of the poisoning whenever it was attainable, and it is believed that no modern case of satisfactory conviction can be adduced where there has not been such evidence, or in its absence, the equivalent of confession." Wills, 221.

"The most decisive and satisfactory evidence of poisoning, says this author, is the discovery by chemical means of the existence of poison in the body, in the matter ejected from the stomach, or in the food or drinks of which the sufferer has partaken." Wills, 215.

"It is even maintained, that conviction cannot be considered satisfactory where circumstances of suspicion even, are blended with the scientific testimony, unless the crime be established by adequate evidence independently of moral circumstances." Wills, 233–4.

In the case before us there was no examination of any kind made. The contents of the stomach and bowels were not even noticed until a day afterwards; and this material part of evidence, so important to the ascertainment of

truth, is wholly wanting. In the symptoms, and these alone, is there evidence of guilt.

Before noticing these, it is proper to advert to the weight and consequence assigned to such evidence in books of authority, legal as well as medical. "Medical writers appear to be agreed in opinion that the symptoms and *post mortem* examination, which are commonly incident to cases of poisonings, are such as in general may be produced by other causes." Wills, 211; Wharton's Criminal Law, 3 ed., 391.

The Penny Cyclopedia, in an elaborate article, containing a review of the subjects, says : "It is evident from these circumstances, that in a fatal case of suspected poisoning by an irritant subject, it will seldom be possible to decide upon the evidence of the symptoms alone. When poison has actually been taken, the symptoms are sometimes so modified by circumstances peculiar to the case, that, even where they have been carefully observed, much doubt has remained respecting their cause; and, on the other hand, the symptoms of naturally excited disease often too closely resemble those of poison to permit a positive conclusion being arrived at." Vol. 18, p. 307.

"The circumstances that usually first excite suspicion of poison having been taken are, that the person affected is suddenly attacked by symptoms of severe illness, which come on soon after eating or drinking, without any premonitory indications, which regularly increase in severity without undergoing any important change in their character, and which rapidly prove fatal. All these, however, are far from affording sufficient evidence of poisoning. Suddenness of attack is common to many disorders, as cholera, (whether ordinary or Asiatic,) plague, perforating ulceration of the digestive canal, appoplexy and epilepsy; and even in some cases of fever, the premonitory symp-

toms are too slight to attract the attention of the patient." Ibid, 307.

Whilst, then, symptoms, as a general rule, may not be relied upon as giving satisfactory evidence of the use or presence of poison, the question yet arises, may not symptoms, in the specific case of poisoning by arsenic, by irritent subjects, when applied to those proved to exist in the case under consideration, sustain the conviction and establish the guilt of the prisoner?

It is much to be regretted, that in the solution of these important questions we have not the aid of the intelligent physicians who gave to the jury a description of the symptoms usual in cases of poisoning by arsenic, their statement not being fully incorporated in the record, and only a few symptoms described by one of them; and thus we are necessarily thrown upon our own imperfect knowledge and researches in prosecuting our investigation, upon the authorities cited in the brief of the prisoner's counsel, the positions assumed and the views presented in his argument. It is true the attending physician expresses his opinion that the case exhibited specific symptoms of poisoning by arsenic, yet, with all respect for his intelligence and learning, we should not deem that we had discharged our duty in relying upon that alone without a more extended examination. It must be remembered, too, that his evidence is necessarily imperfect, as he saw none of the symptoms of the first day, nor noticed the appearances of matter ejected from the stomach and bowels at this period most important and interesting of all others to the true understanding of the subject. The witness speaks also of symptoms not specified in the record from which we infer that some, possibly essential to the formation of a right judgment, are omitted. If this be so, it is deeply to be regretted, as the court must decide the case upon the

facts set forth in the record, and are not permitted to presume any not presented.

Let us now refer to the facts developed by the evidence in the case under consideration. The prisoner and the person complaining of being poisoned, a slave named Rebecca, were at work at Mrs. Gerards, in Tallahassee, both engaged in getting breakfast—the woman for the white family.— The prisoner handed Rebecca some cow haslet which he had been cooking in an iron pot, asking her to eat ; she ate about six mouths full and immediately felt a pain in the heart; can't express the rest of her feelings ; felt as if she wanted to throw up but could not just then. Commenced vomiting about 11 o'clock of that day ; was blind when the misery was on, had great pain in the breast, then all over. For two or three months was unable to work much at anything, had not been sick before eating the haslet, felt effects immediately after eating, felt as if going to die ; had painful and bloody discharges." This is the statement of Rebecca herself.

A physician was not called in until the second day ; he speaks of the appearance of the patient as follows : " There was frequent vomiting and discharges from the bowels, both tinged with blood ; legs partially paralyzed, great tenderness about the stomach, patient a week under treatment."

Do these facts as detailed by the witnesses, of themselves afford sufficient and satisfactory evidence of poisoning, and are they such as to remove all reasonable doubt that poisoning and nothing else, produced the symptoms exhibited ? Could not the animal food itself, especially this particular kind, in any supposable case of imperfect cookery, the article itself perhaps unfit to be eaten, or in a bad state of preservation, possibly eaten in a disturbed condition of the stomach have produced such effects ? Could they not

have existed as the consequence of some other cause than arsenic or poison of any kind? Are they indeed attributable to no other cause, and must they be necessarily ascribed to arsenic or some deadly and destructive thing alone?

Medical writers give the following as the usual symptoms in cases of poisoning: "The chief symptoms caused by the internal administration of irritant poisions, are those of severe irritation of some or all parts of the alimentary canal. They commonly excite burning, heat, redness, and swelling, and sometimes ulceration of the lining of the mouth, throat and tongue, difficulty of swallowing, burning pain of the stomach with nausea, retching and vomiting, tenderness on pressure, and tension of the upper part of the abdomen. The matters vomited consist first, of the food or other contents of the stomach, and afterwards of tough mucous, with more or less of blood and bile; the sickness is almost incessant, and is usually accompanied by severe suffering. The pain commonly extends from the stomach along a part or the whole of the digestive canal, with tenderness on pressure and usually constant and painful diarrhea of mucous and loss of blood. The pulse is quick and feeble, there is great prostration of strength, excessive burning thirst, cold and damp skin, extreme anxiety of countenance and manner and often considerable difficulty of breathing."

The most general effect of irritant poisoning is acute inflamation of the stomach, and its administration may therefore be regarded as highly probable in any case in which a competent observer finds the signs of an acute inflamation of the stomach during life and its effects after death.

"In most cases of this kind of poisoning, a burning sensation in the throat is perceived directly after the poison is taken, being the effects of its contact during or soon after

10

the act of swallowing." Penny Cyclopedia, Poison, 307.

Beck represents the symptoms of poisoning by arsenic " as so remarkable as not be confounded with natural dis- ease." He states them to be " marks of irritation extend- -ing from the throat to the rectum, the difficulty in swallow- ing, the pains of the bladder in passing water, the affec- tions of the genitals, the vomiting and bloody diarrhœa, ex- treme weakness." 2 Beck, 417.

The same writer gives us the earliest symptoms, sickness or faintness, succeeded by pain in the region of the stom- ach, most commonly of a burning kind, much aggravated by pressure; violent fits of vomiting and retching, with a dryness, heat and tightness in the throat, creating an in- cessant desire for drink, hoarseness and difficulty of speech, matter vomited greenish or yellowish, but sometimes streaked or mixed with blood. The burning of the throat not always present, sometimes so severe as to be attended with fits of suffocation and convulsive vomiting. Diarrhœa generally, not always—when this is severe the rectum is excoriated and burning heat felt there and along the whole of the alimentary canal; mouth and lips inflamed and pre- sent dark specks and blisters, lungs affected, shortness of breath, tightness across the chest and in a few cases actual inflamation, &c., &c., p. 370.

Where life is prolonged several days or saved, the early symptoms are of the inflammatory variety, as just de- scribed. The subsequent ones are referrable to nervous irritation. They vary from coma to an imperfect palsy of the arms and legs, and between these extremes are ob- served epileptic fits or tetanus.

Among occasional results where life is saved are irrita- bility of the stomach, attended with constant vomiting of food, loss of the hair and disquamation of the cuticle, sore- ness and inflamation of the eyes," &c. Ibid, 372.

It will be clearly perceived, we think, that the case before us is defective in many of the most prominent distinctive symptoms described by the authors above quoted as most reliable in discriminating cases of poisoning by arsenic from those of disease produced by other causes. The symptoms exhibited in the present case are very few, and by no means create the clear and distinct impression upon the mind which is made by those described by authors on medical jurisprudence as peculiar to this particular kind of poisoning.

Passing this branch of the subject, we next proceed to the enquiry whether there are other circumstances in the case regarded as giving weight and force to the accusation. "There are particulars of moral conduct," says the writer so often quoted, that "by writers on circumstantial evidence are considered as leading to important and well-grounded presumptions as motives to crime, declarations indicative of intention, preparations for the commission of crime, possession of the fruits of crime, refusal to account for appearances of suspicion, or unsatisfactory explanation of such appearances with evidence, indirectly confessional." Wills, 55.

"If it be proved that a party charged with crime has been placed in circumstances which commonly operate as inducements to commit the act in question; that he has so far yielded to the operation of those inducements as to have manifested the disposition to commit the particular crime; that he has possessed the requisite means and opportunities of effecting the object of his wishes; that recently after the commission of the act in question has become possessed of the fruits or other consequential advantages of the crime; if he be identified with the *corpus delicti* by any conclusive mechanical circumstance as by the impression of his footsteps, &c., if there be relevant ap-

pearances of suspicion connected with his conduct, &c., such as he might reasonably be presumed to be able to account for, but which he will not and cannot explain, &c., &c., the concurrence of all or many of these urgent circumstances naturally, reasonably and satisfactorily establishes the moral certainty of his personal guilt, if not with the same degree of assurance as if he had been seen to commit the deed, at least with all the assurance which the nature of the case and the vast majority of human actions admit." Wills, 250.

Now, this part of the case is not only deficient and wanting in everything to create a presumption unfavorable to the prisoner, but the proof of the person alleged to be poisoned removes and prevents a supposition of this even. "She and the prisoner never had a falling out, and were always on good terms." She was a slave, too ; had no money to tempt her destruction. There was nothing to gain—no fear of loss.

Having thus considered the facts of the case and the law connected therewith, it may aid in the consideration of cases depending upon circumstantial evidence to refer to the rules and maxims which philosophic wisdom and judicial experience have laid down as safeguards of truth and justice with respect to evidence in general, and which apply with peculiar force to cases of the present character.

" The facts alleged as the basis of the inference must be strictly connected with the *factum probandum*." Wills, 177.

" The circumstances proved must lead to and establish to a moral certainty the particular hypothesis assigned, to account for them. In other words, the facts must be of such a nature that their existence is absolutely inconsistent with the non-existence of their alleged moral cause

and that they cannot be explained upon any other reasonable explanation." Ibid, 187.

" The conclusion drawn from the premises assigned as its basis, must satisfactorily explain and account for all the facts to the exclusion of every other reasonable solution." *Ibid* 187.

"If the circumstances are equally capable of solution upon the hypothesis of innocence, as upon that of guilt they ought to receive a favorable construction, and to be discarded as presumptions of guilt." *Ibid* 187,–8.

" If there be any reasonable doubt as to the proof of the *corpus delicti*, or as to the reality of the connection of the circumstances of evidence with the *factum probandum*, or as to the proper conclusion to be drawn from these circumstances, it is safer and therefore better to err in acquitting than in convicting." *Ibid* 189, 190.

These rules are not needed to the conclusion we have arrived at in the present case.

It has been seen very clearly, that there is no direct proof of poison traced to the prisoner from the beginning to the end of this transaction—none of the fact of poisoning. That the indirect proof considered satisfactory in such cases—that of chemical analysis and tests applied to the matter ejected through the influence of the poison from the stomach and bowels, and of all moral circumstances is wanting. That the only fact relied upon, that of symptoms admitted in cases of this nature to be unsatisfactory and unreliable, in this case is particularly defective and unsatisfactory.— Where then is there ground for conviction? Without saying that there is none, we are clearly of opinion that there is not sufficient to justify the conviction, and that the prisoner is rightfully entitled to a new trial.

The judgment will be reversed and the cause remanded for a new trial and other proceedings to be had.