E. J. FUDGE, *Plaintiff in Error,* G. THE STATE OF FLORIDA, *Defendant in Error.*

Opinion filed March 9, 1918.

When the testimony in a criminal case is purely circumstantial, and merely raises a suspicion that the accused may be guilty, it will not sustain a conviction, and in such case it is error to deny a motion for a new trial.

Writ of Error to Circuit Court for Escambia County, A. G. Campbell, Judge.

Judgment reversed.

*Nelson & Laird,* for Plaintiff in Error;

*Van C. Swearingen,* Attorney General, and *C. O. Andrews,* Assistant, for the State.

SIMMONS, Circuit Judge.—The plaintiff in error was indicted and tried in the court below for the murder of his two little girls, Ethel and Tennie, aged seven and ten years, respectively. The trial resulted in a verdict of guilty of murder in the first degree with a recommendation of mercy.

There are numerous assignments of error, the great majority of which are abandoned here, and as to those remaining which are predicated upon rulings of the trial court we find no reversible error. The principal contention of the plaintiff in error is that his conviction is not sustained by the evidence.

The record is voluminous, but the outstanding features of the evidence are few and simple. While there are some conflicts in the testimony, these arise largely at non-vital points. The real conflict hangs upon the construction to be placed upon the testimony.

The plaintiff in error is a widower, and until the happening of the tragedy out of which this case arises was the father of three motherless children, these children being the little girls he is alleged to have killed and a boy, Bascom Fudge, about eight years old. Early in the year 1916 he moved from Nashville to Pensacola and put his children in charge of their aunt—a sister of their dead mother, the two families residing together until about ten days before the little girls were killed, when the aunt and her husband moved out into the country to McDavid.

On the morning of June 27th, 1916, the plaintiff in

error was without work, and had only a few cents in money. He had some simple food in the house, of which he prepared breakfast, with the assistance of one of the children. As to which one of the children helped him the testimony is in conflict. He says Tennie helped him. The little boy says he is the one who helped.

The little girls had been slightly sick for two days, complaining of some gastronomical symptoms, and while the faher was engaged in the preparation of breakfast he sent Bascom over to another aunt's house to get some sweet milk for them. The aunt had no sweet milk, and they proceeded with the breakfast they had. Tennie came to the table, but as to whether or not she ate anything the testimony of the father and son is in conflict, the former saying she did, and the latter that she did not. Ethel did not come to the table.

Soon after breakfast the father took a plane (he being a carpenter by trade) and some of his dead wife's clothes, and started down town, accompanied by Bascom. The dog followed them to the gate, whereupon the father told Bascom to walk along while he should go back and place the dog in a shed in the rear of the house. The boy loitered along for a few yards, when the father returned and they proceeded down town.

The father sold the clothing to some women along the way, and sold the plane at a cabinet shop near the waterfront. Then he proceeded to a service club and drank a bottle of beer. While at the club he was told that work awaited him at the Navy Yard, he having theretofore applied for such work and received instructions to report at the club from time to time. He spent the remainder of the forenoon and a large part of the afternoon around the fish-house on Palafox Wharf helping some colored men to catch a large shark, assisting in

cutting off its tail, photographing it, and calling people's attention to it. He gave Bascom some money with which to get a lunch, but seems to have eaten nothing himself.

In the late afternoon the father and son returned home and found the house closed. The father sat down upon the front steps and sent Bascom to his aunt's house to look for the girls. They were not at their aunt's, and then he sent him down to the bayshore park to look for them. They were not at the park, and when the boy so reported, his father put him through a window and had him unlock the door from the inside. It was then near sunset. Inside the house they found the dead bodies of the two little girls prone upon the floor, a 22 calibre bullet hole through the body of each in the region of the heart, and Bascom's 22 calibre rifle lying upon the floor near the elder one. Tennie was shot directly through the heart, and was cold and stiff. Ethel was shot through the chest just below the heart and a little to the right, and was not quite so cold and stiff.

Neighbors were called and the boy was sent to notify his aunt. About the time the first neighbors were arriving the father took from a book on a table in the room three notes, all in Tennie's handwriting, which notes are here set forth.

"Pensacola, Florida, June 16th, 1916.

"Don't blame Papa for what I have done as Papa is out of work and got no money for us to live on we are better off dead than living as we have lived the last week. Aunt Bee will be sorry for what she has done us it will all come back to her on Judgment Day. Tennie Fudge."

"Pensacola, Florida, June 24, 1916.

"Aunt Bee: Ethel and I rather be dead than to go

to an orphans' home because we know how we would be treated. Bascom can look out for himself but we cant. We have been treated like little negroes here, we know how we would be treated there. We can hardly turn around without being whipped or scolded.

Goodby,

Ethel and Tennie."

"Pensacola, Florida, June 24, 1916.

"Dear Papa: You are going to put us in the orphans' home and we would not like to go there because we know how they would treat us. Aunt Bee wants us to be sent there and you know you will have to give us away. And there is no use living that way. Ethel and I are gone so goodby.

Tennie and Ethel Fudge."

The children's mother committed suicide in Nashville about five months before their death, and Tennie had on several occasions expressed deep regret that she did not also kill her and Ethel, "as she promised." Also, the father had planned to place them in the Pearl Egan Home, having gone to see Mrs. Fisher, president of the Ladies' Board of Directors of the Home, for the purpose of learning the terms upon which they would be received. The children knew of this plan concerning them, as is evidenced by Tennie's notes and by the testimony of two or three witnesses.

There were some discrepancies in the testimony as to the promptness with which the father found the notes, and touching the measure and sincerity of his grief. But there is no dispute that the notes were actually written by Tennie.

The State introduced certain testimony raising some doubt as to whether Tennie's arm was long enough to have fired the shot which killed her; but this testimony

was not conclusive, and although she was barefooted at the time, no account seems to have been taken of the age-old custom of pulling the trigger with the toe in such cases, although this latter theory would also account for the upward range of the bullet.

In early March before the children were killed in June, their father met a woman of the *demi-monde* named Bertie Mundy. He visited Bertie several times at the house of prostitution where she was lodged, bought a number of her favors, furnished her some beer at fifty cents and a dollar a bottle, and gave her some kind of a cheap ring. On one occasion he met her on the street, and, seeing a rooming-house undergoing repairs, suggested to her that they "tie up," rent that house and make some money. She said she considered this an offer of marirage, which she declined because she cared nothing for him, considering his attentions only in the light of business transactions. She said she knew about the children—that he had told her about them, and "spoke very nicely of them." She testified that she met him on the street just a few days before the death of the children, and that upon being informed that his brother-in-law and family had moved away she volunteered to interview her mother about taking charge of the children for him. She said she had not theretofore seen him for the space of about two months. He admits meeting her on the street, and talking to her for a minute or two, but denies that she said anything about her mother taking charge of his children.

At the time the children were killed the entire family carried funeral benefit insurance. The policies are not before us, but the agent of the insurance company testified that they were limited to funeral expenses. At any rate, the amounts payable under them were small.

There was a great mass of irrelevant and purely exploratory testimony, as is usual in cases depending upon circumstantial evidence, but this statement contains the main facts of the case, and these facts are taken largely from the State's testimony.

The theory of the State seemed to be that the plaintiff in error was in love with Bertie Mundy, and that she would not marry him because he was encumbered with the children; and, furthermore that he was in desperate need of money. According to this theory, he is supposed to have killed the children for the double purpose of getting their funeral insurance and removing them as obstacles between him and marriage with Bertie. There is some testimony to the effect that he was not very demonstrative in his affection for the children; but it does appear that they usually ran to meet him and embraced him when he came home; that he sometimes romped and played with them; and that when little Ethel was sick with scarlet fever in February and March he went to the pest-house with her and was her sole nurse and companion until she was released.

It seemed to have been a further theory of the State that the plaintiff in error at some time forced Tennie to write the three notes, and that he killed her and her sister either while Bascom was gone after the milk, or when he went back in the yard with the dog. But these are only theories, with no substantial testimony to support them.

While the testimony raises a vague and attenuated suspicion that by some rare chance the plaintiff in error might have murdered his children, there is no whit of it that points with any certainty in that direction, and the motion for a new trial should have been granted on this ground.

The judgment of the court below is reversed and the case is remanded for further proceedings in accordance with this opinion.

BROWNE, C. J., AND TAYLOR, WHITFIELD AND ELLIS, J. J., concur.

WEST, J., disqualified.