MARY LEE, *Plaintiff in Error*, v. THE STATE OF FLORIDA, *Defendant in Error*.

En Banc.

Opinion filed June 26, 1928.

*Paul Carter,* of Marianna, for Plaintiff in Error.

*Fred H. Davis,* Attorney General, and *H. E. Carter,* Assistant Attorney General for the State.

STRUM, J.—Upon an indictment charging murder in the first degree, plaintiff in error, who will hereinafter be referred to as the defendant, was convicted of manslaughter.

Amongst other things, it is contended on writ of error that the *corpus delicti* is not established by the evidence; and that the verdict is contrary to and unsupported by the evidence.

The indictment charged that the defendant killed Marion Stanley, alias Mary Lee Stafford, by striking deceased in and upon her face and mouth with her (defendant's) fists and hands, which striking occurred near a certain creek in which was a great quanity of water, which said striking caused the deceased to fall into the creek after which the defendant siezed deceased with her hands and then and there held the deceased under the water in said creek until she then and there choked, suffocated and drowned.

The state's evidence establishes that the defendant is a negro woman and the deceased a white woman and that

both were confined in the county convict camp of Calhoun County. During the morning of September, 29, 1925, the body of the deceased was found in the water of Stafford's Creek about 150 or 200 yards from the convict camp. Death had been caused by drowning. It further appears from the evidence that the deceased, in company with a negro girl, Bertha Lee, aged about eleven years, and the step-daughter of the defendant, left the convict camp ostensibly to go in bathing in the creek during the afternoon before the body was found the next morning. The deceased was clad only in a night gown. When they arrived at the creek, Luther Bodiford, a young white man, was seated on the bank of the creek, and the deceased on arriving at the creek took a seat beside Bodiford. J. B. Nichols, a State's witness who was working around the convict camp, left the camp on a mission which took him across the creek between four and five o'clock in the afternoon. As he crossed the creek, which was a small one, he saw the deceased and Bodiford on the bank of the creek at a point near where deceased body was found next morning. Bodiford was lying down, and the deceased was sitting nearby. When this witness left the convict camp, the defendant was at the camp. Within a short while the witness returned again to the convict camp by approximately the same route but did not see the deceased or Bodiford at the creek as he passed on his return. It was then late in the afternoon, ''getting on toward sundown.'' When this witness returned to the camp, the defendant was there.

While the deceased and Bodiford were at the creek, they were visited by two other young men, who stayed about five minutes. At this time, the deceased and Bodiford were standing near each other in the edge of the water and the deceased had in her hand a quart fruit jar which was about half full of a white liquid. The deceased was addicted to

the use of cocaine, morphine and whiskey, "anything she could get hold of."

When the body of the deceased was found, Bodiford was placed in jail and testified at the inquest, and again before the grand jury, that he hid in the bushes near the creek and saw the defendant strike the deceased in the mouth and jump astride her and drown her. Thereupon the defendant was indicted for murder in the first degree. Boniford admitted in his testimony given at this trial that his former testimony was false in its entirety, and that his reason for giving the original testimony was that he was told "that was the way for me to get out." Bodiford further testified at this trial that he left the creek about the same time as the other two men. So far as the record discloses, Bodiford was the last person who saw deceased alive.

There was no evidence of a struggle around the spot where the body was found or elsewhere in the vicinity of the creek. No one testified to hearing any outcry, though the convict camp and at least one dwelling house were near by. The body of the deceased was carefully examined, when found, by a member of the coroner's jury and by a practicing physician. These witnesses both testified that death was due to drowning; that there were no brutal bruises or wounds on the lips or face and that the body bore no finger marks, bruises, scratches or any other marks of violence of any nature, except that deceased had two teeth broken out, one of which appeared to be an old break and looked like a tooth that had once had a crown on it, while the other tooth, one of the front incisors, was broken off even with the gum and appeared to be recently broken as there was a little bloody water around the root. There was also a small minor scratch on the inside of the upper lip, "nothing more than a mere scratch," about the size of a field pea, and of no considerable depth, "a mere surface

wound.'' Other than that, there was no evidence of a blow or other violence. The scratch appears to be ''freshly broken.'' The doctor testified that he would not swear deceased received a blow in the mouth; that the tooth could have been broken by the body being driven up against a stump or log in the creek, but he thought that would have been ''highly improbable''; but that it would be ''entirely probable'' that she might have broken it by falling. The doctor inclined to the opinion, however, that the tooth was broken off before death, though he would not positively testify to that effect.

The water in the creek was about fourteen or sixteen inches deep where the head of the body was found, and about two and one-half feet deep at the feet. The body was found with one knee and one elbow in the sand of the creek bed and the other arm extended in the direction of her feet. The body was nude when found, and was some forty or fifty yards down stream from the place where people usually went in bathing. The night gown was found ''wadded up'' about twenty feet up stream from the body, both the body and the gown being on the down stream side of a small obstruction or ''drift,'' composed of limbs and trash, situated between the place where swimming usually occurred and the place where the body was found. The testimony indicates that on account of this obstruction the body and the gown could not have drifted from the place usually used for swimming to the place where the body and gown were found.

There is evidence that the defendant changed clothes during the late afternoon or early evening of the day in question, the dress which she first wore being later found in the bottom of a wash tub with some other clothes. This circumstance is of little significance, however, when it is considered that there were no indications of a struggle, and

no marks of violence upon the body which would likely result in blood shed or other stains. And the change was not made until after defendant had reported that deceased was missing. There is further evidence, admitted over the defendant's objection, of threats uttered by the defendant three or four days before the death of deceased. One witness testified: ''I heard Mary Lee say she run this woman to the creek with a pan of hot dishwater. I heard her say she was going to put something over her head sometime and nobody would know where she was, said she would have done killed her if she hadn't been scared they would send her to Raiford. That was on the 25th (of September) and the body of Marion Stanley was found on the 29th. At the time she made these statements Edna May Bodiford and me and my husband was there.'' The statement of this witness was substantially corroborated by the other persons mentioned.

One of the convict guards testified that when he arrived at the camp about sun-down on the afternoon in question, the defendant informed him that the deceased ''was gone''; that she had been looking for her all down the creek and had tracked her to the back gate of a Mr. Davis; that her tracks returned from there and went on down the creek where she had never been before; that the deceased was gone, and defendant could not find her. There is evidence that defendant reported the same facts to Mrs. Davis late that afternoon and cautioned her to lock up her house, otherwise deceased, who had escaped, might steal some clothing from her. Other than that just stated, there is no evidence that the defendant was in the vicinity of the creek during the afternoon. There is evidence that the defendant, who was the cook at the convict camp, went down toward the creek during the afternoon and called deceased, but defendant did not then go to the creek.

So far as the record discloses, there were no eye witnesses to the tragedy. The evidence as to the means by which deceased met her death, as well as the connection, if any, of the defendant therewith, rest wholly on circumstantial evidence, of which the foregoing represents the substance of the evidence adduced by the State. The defendant offered no evidence.

The well settled principles applicable to circumstantial evidence forbid the affirmance of the judgment of conviction.

In a prosecution for crime, the *corpus delicti* may be proven as well by circumstances as by direct evidence, although the probative deficiencies which sometimes inhere in circumstantial evidence should be borne in mind. Nickels v. State, 106 So. R. 479. In homicide cases, the *corpus delicti* consists of three component elements. First, the fact of death; second, the criminal agency of another person as the cause thereof; and, third, the identity of the deceased person. While the discovery of the body necessarily affords the best (but not necessarily the only) evidence of the fact of death, and of the identity of the individual, and most frequently also the cause of the death, still in homicide cases the *corpus delicti* can not be said to be proven until it is fully and satisfactorily proven that such death was not caused by natural causes, accident, or by the act of the deceased. In homicide cases, when proof of the *corpus delicti* rests upon circumstances, and not upon direct proof, it must be established by the most convincing, satisfactory and unequivocal proof compatible with the nature of the case, excluding all uncertainty or doubt. Like every other essential element of the offense, the *corpus delicti* must be proven beyond a reasonable doubt, by evidence of the character just mentioned. State v. Commonwealth, 21 Gratt. (W. Va.), 809; Joe v. State,

6 Fla. 591. When tested by these well established rules, it is a matter of grave doubt whether the *corpus delicti* is established in this case. See Richardson v. State (Ala.), 114 So. R. 789, a case strikingly similar to this case on the facts; also Joe v. State, 6 Fla. 591; State v. Flanagan, 26 W. Va. 116; State v. Merrill, 78 So. E. R. 699. Smith v. Commonwealth, *supra*; Lovelady v. State, 14 Texas App. 545; Conde v. State, 34 So. W. R. 286; 60 A. S. R. 22; Allen v. State (Miss.), 40 So. R. 744; Pitts v. State, 43 Miss. 472. See also note to Bines v. State (118 Ga. 320), 68 L. R. A. 1; 13 R. C. L. 736; 30 C. J. 287.

That the deceased could have been assaulted by the defendant so effectively as to enable the latter to drown the deceased in a body of water, less than waist deep, without an outcry, in the day time and with others in the immediate vicinity, and without producing any bruises or other marks of violence upon the body of the deceased, other than the relatively minor circumstances of the breaking of a tooth, penetrates far into the realm of speculation and improbability. It would require a most generous and elastic stretch of the imagination to conceive of the possibility.

But pretermitting the question of the sufficiency of the evidence to establish the *corpus delicti*, and assuming, but not deciding, the same to be sufficient, the evidence is fatally deficient in establishing the essential fact that the defendant, and on one else committed the offense.

The rule has been long since established that although absolute metaphysical and demonstrative ceremony is not essential to sufficient proof by circumstances in a prosecution for crime, nevertheless, in order to invest mere circumstantances with the force and effect of lawful proof, those circumstances, taken together, must be of a conclusive nature and tendency, leading on the whole to a satisfactory

conclusion of guilt, and must produce in effect a moral certainty that the accused, and no one else, committed the offense, before a verdict of guilty is authorized. It is not sufficient that the facts create a strong suspicion or probability of guilt, or are consistent therewith; the facts must be inconsistent with innocence. The value of circumstantial evidence, and its effect as proof, depends upon the conclusive nature and tendency of the circumstances relied upon to establish the controverted fact. If any fact essential to a conviction is not legally established to a moral certainty, the evidence is inconclusive, and can not be said to be sufficient in law to satisfy the mind and conscience of the jury. Fudge v. State, 75 Fla. 441; 78 So. R. 510; Davis v. State, 107 So. R. 245; Asher v. State, 105 So. R. 140; Myers v. State, 43 Fla. 500; 31 So. R. 275.

If we assume the *corpus delicti* to be sufficiently established, then the other circumstances in evidence might support a suspicion of the guilt of this defendant, but no more than that. Certainly the circumstances are thoroughly consistently consistent with, if not somewhat persuasive of, the innocence of this defendant. Upon no reasonable view or construction of the circumstances shown in evidence could it be said that such circumstances are of that conclusive nature or tendency necessary to invest mere circumstances with the force and effect of proof, nor that those circumstances are sufficient to establish to a moral certainty that defendant, and no other person, committed the offense, nor to lead on the whole to a satisfactory conclusion of guilt.

Though of no controlling force, it is at least significant in weighing the probative force of this circumstantial evidence that the defendant, though indicted for murder in the first degree, was convicted of manslaughter. If the deceased came to her death in the manner described in the indictment, it was obviously a most atrocious and diabolical

murder, and one which would not elicit the slightest sympathy for the perpetrator. There are no mitigating circumstances in the record. Either it was murder in the first degree, or a case of death from accidental causes.

In view of the evidence as it appears by this record, it was error to overrule the motion for a new trial.

Reversed and new trial awarded.

WHITFIELD, TERRELL AND BROWN, J. J., concur.

ELLIS, C. J., AND BUFORD, J., dissent.