157 So.2d 445 (1963)
FRANCES J. PACETTI, APPELLANT,
v.
STATE OF FLORIDA, APPELLEE.
No. 3321.
District Court of Appeal of Florida, Second District.
November 6, 1963.
*446 Hal S. Ives, of Ives & Davis, West Palm Beach, for appellant.
Richard W. Ervin, Atty. Gen., Tallahassee; Leonard R. Mellon, Asst. Atty. Gen., Miami, for appellee.
SMITH, Chief Judge.
The appellant appeals from her conviction of the crime of murder in the second degree after trial by jury. Although there are numerous assignments of error, the sole point argued is that the circumstantial evidence is legally insufficient to support the conviction.
On September 30, 1961, Samuel Homer Shelton was found dead in his home. The victim's body was found nude, lying face down on a bed. Death was caused by a .22 calibre bullet wound in the head, the projectile having entered the victim's head one and one-half inches behind the left ear. There were no indications of other trauma. The ballistics expert testified that the bullet was so fragmented that he could only say that it came from any one of many thousands of .22 calibre Rohm Sontneim derringers. A fully loaded 32-20 revolver was found on a shelf of the night stand, and there were two other weapons (a P-38 and an unloaded 32-20 revolver) in a shoe box, with a number of rounds of ammunition for two of the pistols. No expended shells were found, and there was no evidence that any of the pistols had been fired recently.
For approximately eleven years before Shelton died, he and the defendant were what the defendant termed "sweethearts." Both Shelton and the defendant were married, but Shelton's wife died sometime in April of 1960. Although they lived with their respective spouses, they saw each other three or four times a week.
One witness who had known the defendant for six or seven years testified that she and the defendant had several conversations regarding the defendant's relationship with Shelton. These conversations occurred about fourteen to fifteen months before Shelton's death. The witness testified that the defendant told her that she and Shelton had been sweethearts for a long time, but that they had had some trouble over his *447 association with another woman. According to the witness, "Mrs. Pacetti said that * * * if he [Shelton] ever, ever married another woman that would be the day, that would be the day she would kill him, that she could not live without him. * * *" A month after the foregoing conversation, the defendant told this witness that she did not see how she could go on the way things were between her and Shelton because she had found so many women in his life. She said she knew he would find somebody and get married, and she thought he was trying to shake her. She then said: "I will just shoot him. I don't see any other way out." The witness further testified as follows:
"Yes, she called me a time or two after that and each time she said, `I don't see how I can go on.' Then she told me about another woman, she said that, that she had keys to his house and been out to his house and had found a picture on the wall with a name on it and she went through the mail that had arrived for Mr. Pacetti [sic] and found a letter that he had written, that his wife had written to him. She was at that time  a letter, once upon a time at this time the letter was on her dresser and had been written to Mr. Shelton."
The witness then testified that the defendant had told her that Shelton was in the bolita business. The witness testified of her own knowledge that Shelton had been going with three women in addition to the defendant and that the defendant knew about these other three women before June of 1960. On redirect examination, the witness stated that in June of 1961 the defendant told her that she, the defendant, could not take it, that she loved him (Shelton) better than she loved her life and that she would never give him up. However, on re-cross-examination, the witness stated definitely that the last time she had any conversation with the defendant was in June of 1960.
Another witness testified that she had seen Shelton socially during 1960 and that while she was entertaining Shelton in her home in June of that year, Mrs. Pacetti arrived and informed the witness, in Shelton's presence, of the intimate relationship between Shelton and herself (Mrs. Pacetti). The defendant asked Shelton to leave, and he did. This witness further testified that in September of 1960 Mrs. Pacetti telephoned her to say that Shelton was having an affair with yet another woman. On cross-examination, this witness admitted that, prior to June of 1960, she was in love with Shelton and had told him so.
The other woman referred to in the telephone conversation mentioned above testified that she saw Shelton socially during the years 1960 and 1961.
A tenant-farmer who worked on Shelton's farm testified that Shelton drove out to the farm almost every day of the week, and that three or four times a week Mrs. Pacetti would come out to the farm. She and Shelton would drive off together and return hours later. The tenant-farmer's wife related that she had had several conversations with Mrs. Pacetti and that approximately one month before Shelton died, Mrs. Pacetti had said that she didn't want Shelton to remarry.
On Monday during the week of Shelton's death, a physician drew a sample of Shelton's blood, and on Wednesday Shelton obtained a certified statement from the physician that his blood was negative for venereal disease.
On Tuesday, Shelton and the defendant were at the farm. On Wednesday afternoon, between four and five o'clock, Shelton was at the farm alone. He had previously advised his tenant-farmer that he was leaving on Thursday. Another witness saw Shelton at a public telephone booth at about 6:45 p.m. on Wednesday. Shelton was not again seen alive by any of the witnesses. A neighbor who lived approximately *448 200 feet from Shelton's home testified that he heard what he believed to be a gun shot at about eleven o'clock Wednesday night. On Thursday morning, Shelton's brother came to the house, as previously requested by Shelton, to drive him to the airport. He knocked at the door several times but received no answer, so he departed. On the following Saturday, while investigating an automobile parked in the neighborhood, two detectives of the Boynton Beach Police Department came to Shelton's residence. One of the officers detected a foul odor emanating from Shelton's home. Their suspicions aroused, the detectives gained entry into the locked house by removing a pane of glass from a jalousie door, whereupon Shelton's body was discovered. The doctor who performed the autopsy testified that Shelton had been dead for two to five days.
On the same day that the body was discovered, a child found a.22 calibre Rohm Sontneim derringer in a canal approximately three and one-half miles from Shelton's home. This pistol had been ordered by a letter dated August 1, 1961, and signed by Frances J. Pacetti. The letter directed that the pistol be sent to "Francis Willis, P.O. Box 259, Lake Worth, Florida." Enclosed with the letter was Mrs. Pacetti's personal check in the amount of the sale price of the pistol.
Investigating officers testified that in the course of their questioning of Mrs. Pacetti she was asked whether she had "ever ordered, owned or had in her possession a .22 calibre gun," and that she replied that she had not. The officers further testified that, when Mrs. Pacetti was shown the gun found in the canal and asked whether she had ever seen it, she said: "I don't know. Maybe I have, maybe I haven't, but I want to see my attorney."
In testifying in her defense, Mrs. Pacetti admitted her relationship with Shelton. She admitted ordering and receiving the pistol found in the canal, but she stated that she ordered it at the request of Shelton, who (although he had several pistols) wanted a small pistol to carry on his person. Mrs. Pacetti testified that, when the pistol was received, she gave it to Shelton and he recompensed her for the expenses of ordering it. The last time the defendant saw Shelton was on the Wednesday before his body was discovered on Saturday. Mrs. Pacetti testified that she did not kill Shelton.
There was no direct evidence of the manner of Shelton's death. The conviction must stand or fall wholly upon circumstantial evidence. While we do not endeavor here to completely state or restate the law of Florida with reference to the sufficiency of circumstantial evidence to sustain a conviction, we merely note that the many decisions of the courts of Florida are to the general effect that such evidence must be of a conclusive nature and tendency; and it must be consistent with guilt and inconsistent with innocence, leading on the whole to a reasonable and moral certainty that the accused and no one else committed the offense charged.[1] [15] While it has been said many times that absolute metaphysical and demonstrative certainty is not essential to sufficient proof by circumstances in a prosecution for a crime,[2] it has also been said that:
"Evidence which furnishes nothing stronger than a suspicion, even though it would tend to justify the suspicion that the defendant committed the crime, it [sic] is not sufficient to sustain conviction. It is the actual exclusion of the hypothesis of innocence which clothes circumstantial evidence with the force of proof sufficient to convict. *449 Circumstantial evidence which leaves uncertain several hypotheses, any one of which may be sound and some of which may be entirely consistent with innocence, is not adequate to sustain a verdict of guilt. Even though the circumstantial evidence is sufficient to suggest a probability of guilt, it is not thereby adequate to support a conviction if it is likewise consistent with a reasonable hypothesis of innocence. * * *"
Davis v. State, Fla. 1956, 90 So.2d 629, 631-632.
The evidence in this case is insufficient to meet the circumstantial evidence test. The immoral relationship of the defendant with the decedent, and her expressions of threats to his life sometime prior to his death, are sufficient to point the finger of suspicion toward the defendant; but when considered as a whole, we find the circumstantial evidence offered for conviction discloses a possibility of innocence which is as equally strong as the possibility of guilt.
As examples of missing links in the chain of circumstances, we refer to the testimony of one of the witnesses heretofore quoted; i.e., the testimony concerning keys to Mr. Shelton's home. There is no testimony to show what other persons, if any, had keys to his home. As noted, the investigating officers found Shelton's home locked, but the record does not disclose whether the locks were of the type that would require the use of a key in order for a departing person to lock them or whether such a person could have so locked the house without the use of a key. Although the evidence is sufficient to warrant the conclusion that the defendant had a motive, it totally fails to warrant the conclusion that she had the opportunity to effect the death of the decedent. In Frank v. State, 1935, 121 Fla. 53, 163 So. 223, the court was considering a conviction for murder. The facts of that case are so similar to the facts in the case at bar that we are of the view that that decision is substantially determinative of the case at bar. The circumstantial evidence relied upon in that case to sustain the conviction and the court's conclusions therefrom are stated therein as follows:
"* * * It discloses that the deceased and the plaintiff in error had been in business together; that they had had some previous difficulty, that Frank had had an affair with the wife of Bacalis which was without credit to either of them, that Frank had been expelled from a Greek society to which he and Bacalis belonged, but some or all these difficulties had been smoothed out, apparently to the satisfaction of both, though this is questioned. Frank had sold his interest in the business to Bacalis and was trying to get located in business again. Two pistols were found in the house where Bacalis was killed, one on the kitchen floor with one cartridge exploded, and the other over the kitchen sink fully loaded. It was testified that the pistol on the floor at one time belonged to the deceased but disappeared about two years ago, when plaintiff in error was frequenting the place, the telephone wires were disconnected in the house, and some time previous Frank had made violent threats against Bacalis.
"Bacalis was killed while asleep in his own house in the early morning. Two other persons were in the house at the time, one of whom was sleeping in bed with him. Neither of these parties could tell anything about the shooting of Bacalis, though he was shot through the head. The house was locked from the inside, and no incriminating fingerprints or footprints were ever found about the place. Frank lived several blocks from Bacalis, and it was testified by members of his family that he was sleeping in his own home at the time of the killing.
"The state lays the motive for the homicide to the fact that about two *450 months before it took place Bacalis had filed suit for divorce against his wife, charging her with adultery with Peter Frank. At the time the suit for divorce was brought, Bacalis also instituted a common-law action against Peter Frank for $50,000 for alienation of affections. It is further alleged that Bacalis had several thousand dollars in life insurance in which his wife was named beneficiary. In addition to the insurance, he had other valuable property she would inherit in case of his death. The whole affair is a superlatively mysterious one, and, when pondered through, leaves one with nothing stronger than a suspicion that Frank may have committed the deed.
"As a whole, the evidence is far from that degree of certitude required by the rule stated in the forepart of this opinion. It is not conclusive nor does it convince one to a moral certainty that Frank was guilty of the charge against him. The facts are not all consistent with guilt nor are they inconsistent with innocence. In fact, when considered in their most favorable aspect, they fail to close the avenue to other hypotheses as to how Bacalis came to his death.
"There is not a shred of evidence that connects Frank with the scene of the crime at any time near the time of its commission. On this point it could have as appropriately been charged to any other man in the community. The threats Frank was alleged to have made against Bacalis were made weeks before the crime was committed, and it is not shown that any effort was made at any time to put them in effect. The business and domestic troubles between Frank and the deceased had apparently been composed and the inheritance theory of the state as a basis for motive has no support except suspicion. The amount of the inheritance and the status of the parties reduces that suspicion to a shadowy one. It would be contrary to well-settled canons for interpreting circumstantial evidence to let the conviction of plaintiff in error stand."
There is a further similarity between that case and the case at bar in that in the Frank case the defendant was convicted of murder in the first degree with the recommendation for mercy, and in the case at bar the defendant was charged with murder in the first degree and convicted of murder in the second degree.
We note that the order of the court denying the defendant's motion for a new trial upon the ground that the evidence was insufficient to sustain the verdict stated:
"The evidence in this case, being circumstantial, it is required that it be not only consistent with guilt, but inconsistent with innocence. The Court is of the opinion that it was for the jury to determine, under proper instructions on the subject, as to whether this requirement was met."
This opinion stated by the trial court is either erroneous or incomplete in that it is the duty of the court to pass upon the sufficiency of the evidence to sustain the verdict, and, if the evidence was found to be legally insufficient to support the verdict, then it became the duty of the court to grant the motion for new trial. This erroneous or incomplete opinion of the court is not, however, a ground for reversing the judgment of conviction if it is sustainable under any theory revealed by the record on appeal.
For the reasons noted, we are compelled to the conclusion that the circumstantial evidence in this case is legally insufficient to support the conviction.
The judgment is reversed, and a new trial is awarded the defendant.
KANNER, J., and GERMANY, JOHN F., Associate Judge, concur.
NOTES
[1] Davis v. State, Fla. 1956, 90 So.2d 629; Mayo v. State, Fla. 1954, 71 So.2d 899; Head v. State, Fla. 1952, 62 So.2d 41; Stewart v. State, 1947, 158 Fla. 753, 30 So.2d 489; Victor v. State, 1940, 141 Fla. 508, 193 So. 762.
[2] Chason v. State, 1941, 148 Fla. 540, 4 So.2d 691; Lee v. State, 1928, 96 Fla. 59, 117 So. 699; Davis v. State, 1925, 90 Fla. 816, 107 So. 245.